**BULOVA WATCH COMPANY, INC., Plaintiff,**

v.

**K. HATTORI & CO., LTD., Hideaki Moriya, Jason Segal, Larry Lich, Arthur J. Cohen, Jack Murphy and Ben Waldman, Defendants.**

No. 79 C 2543.

United States District Court, E. D. New York.

Feb. 12, 1981.

Meyers, Tersigni, Kaufman, Debrot, Feldman & Gray, New York City, Anthony L. Tersigni, Richard N. Gray, New York City, of counsel, for plaintiff.

Whitman & Ransom, New York City, John M. Hadlock, Paul A. Cable, Michael S. Press, Debra A. Armbruster, New York City, of counsel, for defendants.

I. USE OF JUDICIAL NOTICE ............. 1327

II. FACTS ................................ 1329

 A. Parties ............................. 1329
 B. Allegations .......................... 1330
 C. Moriya's Crucial Role ................ 1331

III. JURISDICTION OVER K. HATTORI
 & CO., LTD. ...................... 1333

 A. Doing Business, N.Y. CPLR 301 ......... 1333
 1. The Law ........................ 1333
 2. Multinational Operations in General ... 1335
 3. Japanese Multinationals in General .... 1338
 4. Japanese Hierarchical Structures ..... 1339
 5. Application of Law to Facts ......... 1340
 B. Long Arm Jurisdiction, N.Y. CPLR 302 .... 1345
 1. The Law ........................ 1345
 2. Application of Law to Facts ......... 1346

IV. JURISDICTION OVER INDIVIDUAL
 DEFENDANTS .................... 1347

 A. The Law ........................... 1347
 B. Application of Law to Facts ............. 1348
 1. Segal .......................... 1348
 2. Murphy ........................ 1348
 3. Moriya ......................... 1349
 4. Waldman ....................... 1349

V. CONCLUSION ......................... 1349

WEINSTEIN, Chief Judge.

This motion to dismiss for lack of personal jurisdiction (F.R.Civ.P. 12(b)(2)), presents a classic problem in adjudicating claims against a multinational corporation using subsidiaries to penetrate the American market. Under current doctrine, to be subject to personal jurisdiction by a state, the parent must 1) itself be present because it is doing business in the state (N.Y. CPLR 301); or, 2) under a "long arm" concept, have conducted specific activities out of which the cause of action arose either in the state or outside the state with foreseeable substantial effects in the state (N.Y. CPLR 302); in addition, exercise of judicial power over the person of defendant must not offend our notions of fairness. *See, e. g., International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); Restatement (Second) of Conflict of Laws § 27(1)(g)(h) ("doing business in the state" and "an act done in the state" are bases for exercise of jurisdiction); Restatement (Second) of Judgments § 8, Comment a (Tent. Draft No. 5, 1978) (where party, *inter alia*, does business in state or does act in state relationship is "such that the exercise of jurisdiction is reasonable").

Largely for reasons of historical and conceptual development, the doing business concept treats a defendant corporation as if it were present for all purposes in any kind of a suit to the same extent as a real person living and working here would be. The

long arm alternative was designed to be used only in limited situations in which an outsider has a transient impact on activities in the state and it applies only to claims arising from that narrow contact.

Multinational activities such as those before us present a factual pattern that sometimes does not quite fit into either of the two tidy conceptual categories reflected in N.Y. CPLR 301 and 302. Here the foreign parent corporation may be considered to be doing business under 301 for limited purposes during the period of penetration of the American market before its subsidiaries have matured to relatively full independence. The implications of this view are that the foreign parent may be deemed to be present for the purpose of expanding into a new market by setting up subsidiaries and dealing with competition, while it may not be doing business for the purposes of day-to-day commercial activity such as dealing in watches, cars or sealing wax—e. g., when a suit is based upon negligent operation of a car operated by an employee of a locally organized subsidiary. Similarly, while not within the strict limits of the 302 long arm provision, the parent's actions might be sufficiently within the CPLR's penumbra so that the combination of 301 and 302 read together covers the particular claims asserted and long arm personal jurisdiction lies. None of this would violate any constitutional requirements.

We do not suggest that the present jurisdictional bases be eliminated—a proposal for the legislature rather than a trial court in any event. Nor do we ignore traditional indicia utilized to measure parent-subsidiary control for jurisdictional purposes. Rather, we note that in this as in so many other areas of the law, stuffing new and complex factual patterns into absolutely rigid legal cubbyholes often results in distortion of the facts. Some give in the categories is desirable lest the law lose touch with the real world.

To any layman it would seem absurd that our courts could not obtain jurisdiction over a billion dollar multinational which is exploiting the critical New York and American markets to keep its home production going at a huge volume and profit. This percep-

tion must have a bearing on our evaluation of fairness. The law ignores the common sense of a situation at the peril of becoming irrelevant as an institution.

An apparent growing tendency by the Supreme Court to view jurisdictional bases narrowly in the interest of what it considers to be fairness to defendants is reflected in a few recent cases. *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980), *on remand*, 290 N.W.2d 633 (Minn.1980); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Unreasoned extrapolation of such cases can lead to unfairness to plaintiffs who may be denied a natural forum unless the court carefully analyzes the economic and social realities of the "significant contacts between the litigation and the forum." *Rush v. Savchuk*, 444 U.S. at 329, 100 S.Ct. at 578. *Cf.* Kamp, Beyond Minimum Contacts: The Supreme Court's New Jurisdictional Theory, 15 Ga.L.Rev. 19 (1980) (criticizing recent cases as "not based on present constitutional or social reality"); Comment, Federalism, Due Process and Minimum Contacts: *World-Wide Volkswagen Corp. v. Woodson*, 80 Colum.L.Rev. 1341 (1980) ("abstract notions of territoriality are too mechanical to achieve consistently desirable results").

## I. USE OF JUDICIAL NOTICE

A common sense appraisal of economic relationships is often more useful than prior cases based on situations different in detail. *Meat Systems Corp. v. Ben Langel-Mol, Inc.*, 410 F.Supp. 231, 231–232 (S.D.N.Y.1976), *remanded without opinion*, 551 F.2d 300 (2d Cir. 1976). We tend to come closer to the mark when we examine a business relationship from the practical viewpoint of businessmen rather than through the distorting lens of a legal conceptual framework established in an earlier era. In the multidimensional complexity of real life a two dimensional straight line provides a misleading boundary. A court cannot simply "isolate each contact of the defendant with New York and say that each such contact does not constitute the

doing of business." *Potter's Photographic Applications Co. v. Ealing Corporation*, 292 F.Supp. 92, 100 (E.D.N.Y.1968). Rather it must look to the "cumulative significance" of all activities of a foreign corporation within the state in order to determine whether the corporation is doing business within the state for jurisdictional purposes. *Id.* In doing so it must make use of so much of judicial notice as is required to understand general commercial settings and the particular relationships of the parties and their dispute.

■ Judicial notice may be resorted to on a motion to dismiss for lack of jurisdiction. Fed.R.Evid. 201(f) ("judicial notice may be taken at any stage of the proceeding"); *Singleton v. City of New York*, 632 F.2d 185, 204 (2d Cir. 1980) (dissent) (motion to dismiss for lack of timeliness); *St. Louis Baptist Temple, Inc. v. Federal Deposit Insurance Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (summary judgment); *United States ex rel. McLaughlin v. People of the State of New York*, 356 F.Supp. 988, 990 (E.D.N.Y. 1973) (motion to dismiss on merits); *Fox v. Kane-Miller Corp.*, 398 F.Supp. 609, 651 (D.Md.1975), *aff'd*, 542 F.2d 915 (4th Cir. 1976) (motion for judgment notwithstanding verdict); *Webb v. Nolan*, 361 F.Supp. 418, 420 (M.D.N.C.1972), aff'd, 484 F.Supp. 1049 (4th Cir. 1973) (motion to dismiss for lack of jurisdiction).

■ The information that may be noticed where jurisdiction is sought over a multinational is much broader than the narrow form of "adjudicative" fact either "generally known within the territorial jurisdiction" or capable of "determination by resort to sources whose accuracy cannot reasonably be questioned," Fed.R.Evid. 201(a)(b)—e. g., the day of a week of a certain date. The judgments involved in determining questions of jurisdiction such as the one before us involve mixed questions of law and fact. Inextricably intertwined in the decision is a normative judgment of what is fair and reasonable—a question primarily of law rather than an adjudicative fact. Thus the factual issues are closer on a spectrum to legislative facts necessary in interpreting the meaning of law and filling in its interstitial detail. The data noticed also provide the general knowledge needed to understand and draw inferences from the particular evidence in the controversy before the court to those material propositions of fact necessary in determining jurisdiction.

There is always a danger in the superficial sociological musings of lawyers and judges who must perforce be relatively ignorant of the realities underlying the diverse situations with which they must deal and which they must try to understand. Yet, whether we explore the economic, political or social settings to which the law must be applied explicitly, or suppress our assumptions by failing to take note of them, we cannot apply the law in a way that has any hope of making sense unless we attempt to visualize the actual world with which it interacts—and this effort requires judicial notice to educate the court.

■ A court's power to resort to less well known and accepted sources of data to fill in the gaps of its knowledge for legislative and general evidential hypothesis purposes must be accepted because it is essential to the judicial process. *See, generally,* Davis, Facts in Lawmaking, 80 Colum.L.Rev. 931 (1980). Here flexible judicial notice is required first, in interpreting N.Y. CPLR 301 and 302, and, second, in understanding the relationship of the Japanese parent to its American subsidiaries.

■ In view of the extensive judicial notice taken, based partly upon the court's own research, the court issued a preliminary memorandum and invited the parties to be heard on the "propriety of taking judicial notice and the tenor of the matter noticed" upon motion made within ten days. This procedure complies with the spirit of Rule 201(e) of the Federal Rules of Evidence reading as follows:

(e) Opportunity to Be Heard. A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

Inviting parties to participate in such ongoing colloquy has the advantage of reducing

the possibility of egregious errors by the court and increases the probability that the parties may believe they were fairly treated, even if some of them are dissatisfied with the result.

Accepting this invitation, the defendant Hattori submitted affidavits and separate materials and reargued the motion. These submissions were most helpful and resulted in the court's modifying a number of conclusions, but not the final result.

## II. FACTS

### A. Parties

Plaintiff Bulova Watch Co., Inc. charges K. Hattori & Co., Ltd. and individual defendants Moriya, Segal, Murphy, Waldman and others with unfair competition and disparagement and with engaging in a conspiracy to raid plaintiff's marketing staff in order to appropriate plaintiff's trade secrets.

Bulova is a New York corporation with its principal place of business in Flushing, New York. It manufactures and sells watches and claims to have the largest direct sales marketing system in the watch business.

Hattori is a company incorporated under the laws of Japan with its principal offices in Tokyo. It owns all the stock of Seiko Corporation of America (SCA), a New York corporation. SCA owns all the stock of Seiko Time Corp., Pulsar Time, Inc. and SPD Precision, Inc., all New York corporations. Hattori contracts in Japan for the manufacture of its watches and sells them under the Seiko, Pulsar and other brand names to its three American sub-subsidiaries. The Japanese parent's annual sales in 1978 were in excess of $1 billion. While the "Hattori group" manufactures many products including computers, measuring instruments, industrial robots, spectacle lenses and electric shavers, Moriya Affidavit of January 21, 1981 at ¶ 3, watches and clocks account for approximately ninety percent of Hattori's sales. Securities Report Series 1979, Exhibit 5 to Defendant's Supplemental Memorandum at 8. A very substantial amount of its total revenue is derived from exports of watches and time-pieces, the United States being its largest foreign market. In 1980 over four million Hattori timepieces were sold in this country at prices to the consumer of one hundred twenty-five dollars and higher—far more than half a billion dollars at retail. Oral Statement of Defendant, Hearing, February 11, 1981.

Hattori sells products to distributors in over one hundred countries around the world. Wholly-owned subsidiaries of Hattori handle distribution of Hattori's products in about ten of those countries, including the United States. In the rest, or the great majority of the countries in which Hattori's products are sold, sales are made by Hattori or its subsidiaries to independent distributors who conduct their own advertising and other marketing activities and maintain their own repair centers pursuant to agreement or arrangements with Hattori. Moriya Affidavit of January 21, 1981 at ¶ 4. Hattori has never directly marketed its products in any country except Japan. Id.

Hattori's United States subsidiaries sold Seiko-branded products totalling over $50,000,000 in wholesale dollars in 1979 to retail customers and wholesale distributors in the Caribbean, South America and Europe. SCA has also made substantial investments in third countries to assist Hattori in selling its Japanese manufactured timepieces. It owns one hundred percent of the capital stock of Pulsar subsidiaries which it has established in Canada and Europe during the past two years. Seiko Time Canada, Ltd., in 1979, represented an investment of $5,000,000 and accounted for Canadian sales of Hattori products in excess of $35,000,000 in wholesale dollars. In 1980, Seiko Corporation of America also acquired one hundred percent of the stock of a Brazilian corporation, Seiko Time, Ltd., which in turn acquired all the stock of Hase, S. A., a company which sells Hattori's Seiko-branded products in Brazil. Memorandum of Hattori, January 21, 1981 at 20.

From 1967 to 1971, and again from 1975 to July, 1979, Moriya was assigned by Hattori to New York. During the period when

the events complained of occurred he was president and director of SCA and its corporate predecessor, sole director of Pulsar Time and SPD Precision, director of Seiko Time, an officer of two other of Seiko's American distributors and a director of a third. While in New York, Moriya held the following positions with Hattori: Deputy Manager and Manager, International Marketing Department and Manager, Personnel Department. Securities Report Series 1979, Exhibit 5 to Defendants' Memorandum in Relation to the Motion to Dismiss at 6, 7. Moriya's immediate superior was Reijiro Hattori, Chairman of SCA and second-in-command at Hattori.

At the date of the filing of the complaint Moriya was a director of Hattori, to which he was elected upon his return from his American assignment. After this action was started he was named Chairman of SCA and apparently he did not resign his position as its president upon his return to Tokyo until sometime after the complaint was filed. Exhibit 2 to Codraro Affidavit.

Segal, a domiciliary of California, was Bulova's Western regional sales manager; he left Bulova in July, 1978 to join Omichron, Inc., a Seiko distributor. Murphy, a resident of Texas, is a former Bulova Chicago regional sales manager who left Bulova in late October, 1978 to join TexChron, a Seiko distributor partly owned by SCA. Waldman, who has lived in Texas for many years, is a former Bulova Southwestern regional sales manager who left Bulova in early December, 1978 to join SPD Precision, Inc.; after the incorporation of Pulsar Time, Inc., in early January, 1979, he became field sales manager for that company. Two other defendants, Lich and Cohen, do not object to personal jurisdiction.

B. *Allegations*

Between July and December of 1978, six members of Bulova's staff—three regional sales managers and three more senior executive personnel—left Bulova to join either a Seiko subsidiary or a Seiko distributor. During December, 1978 four Bulova salesmen joined SPD Precision's Pulsar division which in January, 1979 was separately incorporated as Pulsar Time, Inc. Sometime during 1979 a number of Bulova salesmen were hired by Pulsar Time. What sharply divides plaintiff from defendant is the question of whether these hirings were the result of a conspiracy among defendants to appropriate Bulova's trade secrets and marketing system and to damage Bulova and destroy its business and reputation.

Plaintiff alleges that Hattori and Moriya decided during 1978 to market a new line of watches, Pulsar, a trademark that was acquired by Seiko Time in September, 1978. Defendants' Reply Memorandum at 18. Plaintiff also alleges that the decision was taken by Hattori and Moriya to organize a clock division of Seiko Time. Codraro Affidavit at ¶ 19. Seiko watches had been marketed through fifteen Seiko regional distributors, *Id.* and Moriya Deposition at 160–161, but the Pulsar watches were to be marketed directly to retail outlets. To accomplish this, a direct sales network had to be put quickly into place. Codraro Affidavit at ¶ 20. It is contended that as part of the plan Moriya hired Schwartz, who had been vice-president and director of marketing at Bulova, to head the Pulsar operation.

In the beginning of October, Schwartz and Moriya met to discuss the Pulsar marketing strategy and Schwartz recommended that Moriya hire Cohen as director of sales. Meetings were held between Cohen and Schwartz, and Cohen was offered employment at SPD Precision with the view to directing Pulsar sales. Codraro Affidavit at ¶ 19. Moriya, Cohen and Schwartz decided that a sales force of twenty would be required for the first year, 1979, Cohen Deposition at 35–36, and Cohen was told not to "divulge the name of his new employer" for one month. Hattori Memorandum, January 21, 1981 at 27, Codraro Affidavit at ¶ 19, Cohen Deposition at 47. He recommended the hiring of Waldman, a Bulova regional sales manager. In early December of 1978, Waldman met with Cohen and Schwartz in New York, and the next day Waldman left Bulova to join Pulsar as field sales manager. In order to implement the goal of hiring twenty salesmen by January 1, 1979, the three ex-Bulova employees actively solicited other Bulova employees. Codraro Affidavit at ¶ 19.

The hirings that ensued apparently resulted in a meeting between Bulova's then head, Flick, and Moriya at the end of the year, following which the solicitation of Bulova salesmen abated. Codraro Affidavit at ¶ 19, Moriya Deposition at 180–181. Subsequently, however, additional solicitations are alleged to have been made, Codraro Affidavit at ¶ 19, and more Bulova salesmen were hired. Cohen Responses to Interrogatories ¶ 5(a).

During December, special letters were drafted to be signed by Bulova salesmen joining SPD Precision, Pulsar's parent. The letters stated that the employees would not use any Bulova trade secrets and that SPD Precision was not interested in such secrets. It is plaintiff's theory that singling out Bulova personnel for use of these apparently self-serving letters suggests awareness of the impropriety of hiring such personnel.

A Bulova regional sales manager and a Bulova salesman stated that they were solicited by Segal after he left Bulova. McGann Affidavit at ¶ 2, Pierce Affidavit at ¶ 2. Another regional sales manager was solicited by Waldman. Donchin Affidavit at ¶ 2. During July and August, Moriya met four times with Lich, Bulova's director of department store sales and its merchandising manager, and hired him for Seiko Time's ongoing clock operations in early September, 1978. Codraro Affidavit at ¶ 21.

Bulova contends that the concerted action of Hattori, Moriya and the other individual defendants caused serious dislocation and disruption at Bulova's corporate headquarters. The departure of six high level employees is alleged to have damaged sales throughout the country and in New York, and to have contributed substantially to a decrease in sales of some $18 million. Codraro Affidavit at ¶ 22.

C. *Moriya's Crucial Role*

Moriya joined Hattori in Japan in 1954 after finishing his schooling. Exhibit 5 to Defendants' Memorandum in Relation to the Motion to Dismiss at 6, 7. He has never worked for any employer aside from Hattori or its American subsidiaries. Moriya Deposition at 90. As already noted, during the course of his employment with the American subsidiaries he simultaneously held the Hattori positions of Deputy Manager and Manager of the International Division and Manager of the Personnel Department. Exhibit 5 to Defendants' Memorandum in Relation to the Motion to Dismiss at 6, 7. Nonetheless, defendants assert that while in the United States "he performed services for the United States subsidiaries and none for Hattori." Defendants' Letter Filed September 30, 1980 at 2. The court has not been able to see its way to reading the undisputed facts in such an unusual fashion. Common sense, which need not be banished from our reckoning, dictates the conclusion that while in the United States Moriya loyally performed substantial services for Hattori.

Moriya was no mere liaison officer, and his assignment by Hattori was far from casual. He testified that both his tours were undertaken at the behest of his superiors at Hattori. He was sent first in 1967 when Hattori recognized the potential of America as a market for the sale of its watches, Moriya Deposition at 96, and he was ordered to New York "to take care of marketing." *Id.* at 94–95. Moriya understood that his assignment was undertaken to further the interests of Hattori and he admitted that he endeavored to carry out this task. *Id.* at 96. Although he was employed by the Hattori subsidiaries he would not deny that he considered Mr. Unno of Hattori his superior. *Id.* at 98.

While he was in New York as executive vice president of SCA's corporate predecessor, Moriya apparently was instrumental in formulating the marketing strategy that enabled Hattori to establish a formidable position in the American market. *Id.* at 160–163. In 1969 he made the crucial recommendation that a network of independent distributors be established to obviate the need for slowly building up a direct sales network. *Id.* This decision was made jointly with Reijiro Hattori, second in command at Hattori. Moriya also testified that Hattori's board of directors is the architect of the worldwide strategy of marketing Hattori products. *Id.* at 63. It seems plain

from Moriya's testimony that he was attempting to advance Hattori's interests and its international marketing aims by formulating plans for the United States in cooperation with Reijiro Hattori and the Hattori Board. Even if we did not need to view the record in a light favorable to plaintiff, *Loria & Weinhaus v. H.R. Kaminsky & Sons*, 80 F.R.D. 494, 497 (S.D.N.Y.1978), *motion granted*, 495 F.Supp. 253 (S.D.N.Y.1980), there could be no doubt who Moriya's true master was. It is beyond cavil that the establishment of a major presence in the American market is of critical importance to a firm like Hattori. *See, generally*, E. Vogel, *Japan as Number One*, 134–136 (1979) (Japanese firms usually prefer even to defer profits in order to maximize sales and market share); K. Haitani, *The Japanese Economic System: An Institutional Overview*, 93 (1976) (same). The establishment of such a posture required major marketing planning. Moriya was directly responsible for formulating and implementing that strategy, and at all times his primary allegiance was to Hattori.

In 1975, Moriya was again assigned to New York as head of American operations. During his second term, as during his first, Moriya was intimately involved with developing a new marketing system permitting Hattori to sell its newly acquired Pulsar line and its clocks. Moriya testified that he was "organizing the clock department." Moriya Deposition at 175. He decided to build up a direct sales force for the Pulsar line, *Id.* at 176, and he was directly involved in at least two of the hirings of Bulova personnel that are the subject of this action. *Id.* at 174, 177.

Even the advertising for Seiko artfully suggests to the reader the lack of distinction between the manufacturer in Japan and United States subsidiary distributors. It speaks, for example, of "the watch you buy from us" after reference to care in manufacture. A recent advertisement for "Seiko" in a major department store in *The New York Times* included the following copy:

\* \* \* \* \* \*

There's even a chance that the watch you buy is not a real Seiko at all, but an imitation or forgery designed to exploit Seiko's popularity in the U.S. market.

\* \* \* \* \* \*

When Seiko produces a watch for the U.S. market, certain important identification must be stamped or engraved on the movement and the case. Seiko does that *before* final assembly, *before* final quality control testing. So the watch you buy from us is in mint condition, truly representing the best of Seiko technology and craftsmanship.

\* \* \* \* \* \*

When the objective is just to make a sale, not necessarily to make a long-term customer, slick salespeople become more important than knowledgeable ones. And if you need any servicing, they'll probably send you to Seiko. Seiko will give you great service of course, but if the watch is not covered by the valid Seiko warranty, you'll have to pay for it. However, if you buy an obsolete watch, or one that's not meant to be sold in the U.S. at all, don't hold your breath while you're waiting for parts. Because not even Seiko can inventory every part for every watch all the time.

*The N.Y. Times*, Dec. 8, 1980, p. B6 (emphasis in original).

We credit the affidavit of the present president of Seiko Time that he "personally devised" this advertising campaign, "without any consultation with any officer, director or other employee of Hattori." Pliskin Affidavit of January 15, 1981 at ¶ 6. The reason for Seiko's and Hattori's concern was that Hattori was selling watches to third-country markets and these third countries were then shipping watches into the United States market as "parallel" exporters competing with Seiko Time which had to face discounters' price cutting. In support of Seiko's contention that the advertising indicated Seiko Time's independence, there was submitted an article from the November 1980 issue of *Jewelers' Circular Keystone* (p. 104), apparently a reputable journal in this field, describing the dele-

terious effects of this "parallel distribution pipeline" which accounted for nearly one million timepieces in 1979. What is interesting about this article is that it reveals how subtle and close is the cooperation between the United States subsidiaries and Hattori. To implement the American advertising campaign Hattori in Japan simultaneously took action by cutting down shipments to foreign countries in "efforts to tighten the spigot for parallel pipeline goods." *Id.* The *Keystone* article notes that Seiko's "$500,000 public relations campaign" is part of the Hattori-Seiko effort to stabilize the American market. *Id.* It is not credible that the Japanese head office—and Moriya in particular—was unaware of Hattori's worldwide integrated policies reflected in Seiko's American advertising copy.

### III. JURISDICTION OVER K. HATTORI & CO., LTD.

■ In a diversity action such as this, the question of personal jurisdiction is determined in accordance with the law of the state in which the court sits. *Arrowsmith v. United Press International,* 320 F.2d 219 (2d Cir. 1963); Wright and Miller, Federal Practice and Procedure: Civil § 1075, n.50. We need not consider whether the *Arrowsmith* limitation on federal jurisdiction is reasonable in a controversy with national and international implications, or whether a question such as the one we now face should be addressed through nationwide service of process and adjustment of venue by "transfer to the most convenient forum" —a matter for Congress rather than the courts. C.A. Wright, *Law of Federal Courts,* 303–305 (3d ed. 1976). Here New York *in personam* jurisdictional bases suffice to support federal personal jurisdiction and New York is a convenient forum.

#### A. *Doing Business, N.Y. CPLR 301*

##### 1. *The Law*

■ CPLR 301 permits the exercise of such jurisdiction over "persons, property, or status as might have been exercised heretofore." It confers personal jurisdiction over unlicensed foreign corporations that are "doing business" in New York. *Simonson*

*v. International Bank,* 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964); *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965).

■ The definition of "doing business" has been variously stated, but the common denominator is that the corporation is operating within the state "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917); *see, also, Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 953 (2d Cir. 1967) (doing business in New York is carrying out systematic and regular activity within the state); *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851, 853, *remittitur amended,* 20 N.Y.2d 737, 283 N.Y.S.2d 99, 229 N.E.2d 696, *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967) ("continuous and systematic course" of doing business).

■ It is no longer a matter of doubt that a foreign corporation can do business in New York through its employees, *Bryant v. Finnish National Airline,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 439 (1965); *Scanapico v. Richmond, Fredericksburg & Potomac R. Co.,* 439 F.2d 17, *aff'd en banc,* 439 F.2d 25 (2d Cir. 1972), or through independent agents. *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir. 1967), *cert. denied,* 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968).

■ Equally settled is the concept that a corporation may be amenable to New York personal jurisdiction when the systematic activities of a subsidiary in this state may fairly be attributed to the parent. The line of cases from *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), through *Public Administrator of New York County v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967), and *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), es-

**1334**

tablishes the rule that a foreign corporation does business in New York if its affiliated company is in effect a "local department separately incorporated," *Taca International al Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d at 102, 256 N.Y.S.2d at 132, 204 N.E.2d at 331, or it acts as agent by "do[ing] all the business which [the principal] could do were it here by its own officials." *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854; *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d at 121 (independent representative was acting as agent for purposes of the statute).

■ The parent-subsidiary relationship has not in itself been treated as sufficient to establish personal jurisdiction over the foreign parent. *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65 (S.D.N.Y.1979) (100% owned subsidiary); *Baird v. Day & Zimmerman, Inc.*, 390 F.Supp. 883 (S.D.N.Y.1974) (82% owned subsidiary); Restatement (Second) of Conflicts § 52, Comment b (1971). Some additional factor has been needed. *Top Form Mills v. Sociedad Nationale Ind., Etc.*, 428 F.Supp. 1237, 1242 (S.D. N.Y.1977). Such circumstances include direct and indirect control of the local distributor, *Delagi v. Volkswagenwerk AG of Wolfsburg*, 29 N.Y.2d 426, 432, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 897 (1972), treating the subsidiary as an "incorporated division", *Titu-Serban Ionescu v. E.F. Hutton & Co.*, 434 F.Supp. 80 (S.D.N.Y. 1977), aff'd without opinion, 636 F.2d 1202 (2nd Cir. 1980), as an agent or as both, *Tokyo Boeki (U.S.A.), Inc. v. SS Navarino*, 324 F.Supp. 361, 366 (S.D.N.Y.1971). One scholarly analysis suggests that the cases should be read as treating the principal and subsidiary as one for jurisdictional purposes where parent and subsidiary are part of a "single economic entity." *See, generally,* Wellborn, Subsidiary Corporations in New York: When is Mere Ownership Enough to Establish Jurisdiction over the Parent, 22 Buffalo L.Rev. 681 (1973) (criticizing the need to show more than "mere ownership"). Much depends on details of the relationship as is indicated by the detailed analysis in Part III A 5, *infra*, of *Saraceno v. S.C. Johnson & Son, Inc.*, 83 F.R.D. 65 (S.D.N.Y.

1979) and *Marantis v. Dolphin Aviation, Inc.*, 453 F.Supp. 803 (S.D.N.Y.1978).

■ The two tests that have been utilized in determining the closeness of the economic connection both look to realities rather than to formal relationships. The parent corporations will be found to be present in New York: "First, if the relationship between the foreign parents and local subsidiaries gives rise to a 'valid inference' of an agency relationship;" and second, "if control by the parent of the subsidiary is 'so complete that the subsidiary is, in fact, merely a department of the parent'". *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F.Supp. 519, 522 (S.D.N.Y.1975), *quoting Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 528 (S.D.N.Y.1972).

Although the "agency" and "mere department" theories of jurisdiction are stated as separate principles, it should be clear from the mass of cases dealing with this problem that a line cannot be simply drawn between the two. *See, e. g., Tokyo Boeki (U.S.A.), Inc. v. SS Navarino*, 324 F.Supp. 361, 366 (S.D.N.Y.1971) (subsidiary was the same entity as parent for some purposes and its agent for others); *Delagi v. Volkswagenwerk AG of Wolfsburg*, 29 N.Y.2d 426, 432, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 897 (1972) (dictum that control over agent-subsidiary must be such as to render it a mere department of parent). The apparently distinct notions are metonyms for a jurisdictional balancing assessing the fairness of requiring an out-of-state party to defend itself in New York when it derives benefits from in-state activities. The factors to be weighed include the significance of the New York business to the defendant's overall activities. *See Marantis v. Dolphin Aviation, Inc.*, 453 F.Supp. 803, 807 (S.D.N.Y.1978). While "litigation in a foreign jurisdiction is a burdensome inconvenience for any company, in the appropriate case, where defendant's activities abroad, either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [defendant]," *Frummer v. Hilton Hotels Interna-*

*tional, Inc.*, 19 N.Y.2d 533, 539, 281 N.Y.S.2d 41, 45, 227 N.E.2d 851, 854 (1967), such litigation is "part of the price which may be properly demanded of those who extensively engage in international trade." *Id.*

■ A New York subsidiary of a Japanese parent could—and no doubt would—invoke whatever rights its parent had under applicable Japanese-American treaties. This would be so even though the subsidiaries were actually New York, not Japanese entities. *See Avigliano v. Sumitomo Shoji America, Inc.*, 638 F.2d 552, 556 (2d Cir. 1981) ("To hold that the Japanese business enterprise forfeits its rights under the Treaty merely because it chooses to function through a wholly-owned locally-incorporated subsidiary would in our view disregard substance for form . . ."). It would be unfair as well as paradoxical if the parent could transfer to its subsidiaries benefits without shouldering the corresponding burdens.

The test of whether a foreign corporation does business here has been said to be a "simple pragmatic" one, *Bryant v. Finnish National Airline*, 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 629, 208 N.E.2d 439, 441 (1965); *Carbone v. Fort Erie Jockey Club, Ltd.*, 47 A.D.2d 337, 339, 366 N.Y.S.2d 485, 487 (4th Dep't 1975), but the problem with that classic formulation is that simplicity and pragmatism are, more often than not, mutually exclusive. Thus, it would often be a simple solution to find for a defendant on the basis of the relatively immaculate formal separation it has engineered between itself and its subsidiaries. But the pragmatic command of CPLR 301 emphatically rejects such niceties of etiquette. The realities and not the formalities must be dealt with. *Boryk v. deHavilland Aircraft Co.*, 341 F.2d 666, 669 (2d Cir. 1965).

### 2. *Multinational Operations in General*

■ When Cardozo enunciated the standard for doing business in New York, *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917), there would have been little need to consider how, or whether, a foreign-based multinational enterprise would be found to be doing business in New York. For one thing, the term "multinational firm," so common in today's parlance, was first used only in 1960. Aharoni, On the Definition of a Multinational Corporation, in *The Multinational Enterprise in Transition*, 4 (A. Kapoor and P. Grub, eds. 1972). For another, it was not until after World War II that the phenomenon of the multinational enterprise, as we now know it, became a major factor in the world scene. P. Buckley and M. Casson, *The Future of the Multinational Enterprise*, 1 (1976). Since then tens of thousands of subsidiaries have been created or acquired by parent enterprises located in other countries. R. Vernon, *The Economic Environment of International Business*, 200 (1972). By 1972 it was estimated that in a world that produced about $3,000 billion of goods and services a year, something like one-eighth of the output moved across international boundaries. *Id.* at 3. In that same year the value of American investments abroad was $94 billion. N. Fatemi and G. Williams, *Multinational Corporations: The Problems and the Prospects*, 20 (1975).

After the Second World War investment in the United States by foreign parent companies also expanded tremendously so that by the early 1970s non-United States corporations owned more than seven hundred "major manufacturing enterprises" in this country. R. Barnet and R. Muller, *Global Reach*, 27 (1974). Direct foreign investment, defined as ownership by foreign parents of at least ten percent of the equity of an American enterprise, was $3.4 billion at the start of the 1950s, $6.6 billion in 1959 and $26.5 billion by 1974. U.S. Department of Commerce, *Foreign Direct Investment in the United States*, 4, 11 (1976). Total assets of foreign-owned affiliates in the United States in 1974 were $174.3 billion, of which more than one-fifth was Japanese-owned. *Id.* at xiii. These trends have accelerated.

The vehicles of this modern international economic growth were and are the multinational enterprises. Their size is often awesome: the annual sales of General Motors exceeded the gross national products of Switzerland, Pakistan, or South Africa. R. Barnet and R. Muller, *Global Reach*, 15 (1974).

The phenomenon of penetration into the economies of distant areas can be traced through artifacts back into pre-history. But the current situation is in many respects quite different in the sophisticated organizational and legal techniques utilized from even that of earlier periods in American history when foreign financing made so much of our industrial and commercial expansion possible and when American companies like Singer, the American sewing machine company, established manufacturing plants abroad. M. Wilkins, *The Emergence of Multinational Enterprise: American Business Abroad from the Colonial Era to 1914*, 37 ff. (1970); R. Vernon, *The Economic Environment of Business*, 203 (1972). Aside from their magnitude, today's multi-multinationals are unique in the way vast investments in myriad locations are made to serve the interests of a single organization. Large advantages lie in the possibility of making centralized management and investment decisions on the basis of the situations and opportunities prevailing in various host countries. R. Hellmann, *Transnational Control of Multinational Corporations*, 6 (1977); Hadari, The Structure of the Private Multinational Enterprise, 71 Mich.L.Rev. 729, 749 (1973); Vagts, The Multinational Enterprise: A New Challenge for Transnational Law, 83 Harv.L. Rev. 739, 746 (1970). Such an organization has the resources and scope to plan and to utilize world-wide markets and resources. N. Fatemi and G. Williams, *Multinational Corporations: The Problems and the Prospects*, 58 (1975).

The profit motivation for international expansion is common to multinationals. *See* United States Department of Commerce, *Foreign Direct Investment in the United States*, 97 (1976) (basic reason investments outside home countries are made is search for profits); C. Kindleberger, *American Business Abroad*, 8 (1969) ("like Monsieur Jourdain in Molière's *Le Bourgeois Gentilhomme* who spoke prose all his life without having been aware of it, [businessmen] doubtless maximize profits rather than merely follow markets"); *but cf.* R. Vernon, *The Economic Environment of International Business*, 200 (1972) (studies indicate decisions to invest abroad have little structure or rationality). Nevertheless, the means by which the multinational exercises control over its far-flung elements vary. The degree and nature of control may depend upon the nationality of the corporate parent. R. Vernon, *The Economic Environment of International Business*, 10 (1972) (European and Japanese enterprises preserve signs of their origins in banking and trading); Business International, *Managing the Multinationals: Preparing for Tomorrow*, 116 (1971) (U.S. based firms more centralized than European counterparts). The formal structure of the parent's form of ownership also has control implications. Choice among the various corporate modes of entering a market, e. g., by means of licensing arrangement, joint venture, minority-, majority- or wholly-owned subsidiary, has very significant implications for the control exercised by the parent. R. Vernon, *The Economic Environment of International Business*, 214 (1972). Utilization of a wholly-owned marketing-based subsidiary is found where "the . . . retention of unambiguous control of foreign operations is critical to the firm's strategy." J. Stopford and L. Wells, Jr., *Managing the Multinational Enterprise: Organization of the Firm and Ownership of Subsidiaries*, 107 (1972) (most of the sales subsidiaries of the multinationals were wholly-owned in 1966). The decision of marketing-oriented firms to choose wholly-owned subsidiaries means that they can exercise more control over their foreign operation in subtle, indirect ways as well as directly. *Id.* at 112.

Another criterion that will determine the "corporate intimacy" joining a parent and its subsidiary, *Marantis v. Dolphin Aviation, Inc.*, 453 F.Supp. 803, 805 (S.D.N.Y.1978), is the type and range of products being sold. Enterprises with narrow product lines tend to organize their operations on a highly integrated basis, linking production and marketing into tight strategic patterns. R. Vernon, *The Economic Environment of International Business*, 231 (1972). While Hattori manufactures a number of products, the overwhelming concern of its American marketing operation is with its timepieces—constituting ninety percent of its total production by value.

Thus sales subsidiaries tend to be under especially close control where a company produces a limited number of products. In such a case the company has

> a higher stake in the maintenance of quality standards, a higher sense of risk in sharing its technology with others, a higher need for a centralized marketing strategy.... The strategy of [these] firms, therefore, requires relatively tight controls.

R. Vernon, *The Economic Environment of International Business*, 219 (1972).

Finally, a crucial factor in the degree of control over the subsidiary is the age of the subsidiary and the extent to which the subsidiary has been able to develop independently of its parent. A leading scholar of international trade distinguishes multinational firms from national firms with foreign operations: "A multinational firm starts out like a national firm with foreign operations, but after time each national operation takes on a life of its own." C. Kindleberger, *American Business Abroad*, 183 (1969). The history of modern international business enterprise is largely the history of just this development from a national firm with foreign sales operations, to the truly multinational firm with quasi-independent component entities. *See* M. Wilkins, *The Maturing of Multinational Enterprise: American Business Abroad from 1914 to 1970*, 411–439 (1974).

An important question in assessing presence for jurisdictional purposes is whether a multinational has reached a state in its evolution when it can be said that its sales and marketing subsidiaries truly have a "life of their own." C. Kindleberger, *American Business Abroad,* 183 (1969). Although such an organization can generally be defined as "an enterprise which owns and controls activities in different countries," P. Buckley and M. Casson, *The Future of the Multinational Enterprises*, 1 (1976), it is clear that

> there are distinct differences between a company like Unilever, with many manufacturing subsidiaries in dozens of countries; a company like Trans World Airlines, which also operates in dozens of countries, but with distinctly different operations; a company like Bethlehem Steel, with mining operations in seven countries, all supporting the company's manufacturing activities in the United States; a company like Gulf Oil Company, which owns and operates oil fields in several countries and transports and markets oil; and a company like Rolls Royce or Omega watches, with manufacturing operations in one country, but export network and sales and services outlets all over the world. Whether or not we wish to call all these companies multinational, there are notable differences...

Aharoni, On the Definition of a Multinational Corporation, in *The Multinational Enterprise in Transition*, 15–16 (A. Kapoor and P. Grub eds. 1972).

The expanding multinational generally traverses a number of stages. At first it exports its goods to markets abroad, next it establishes sales organizations abroad, then it may license the use of its patents, and finally it may establish foreign manufacturing facilities. At a later stage it may "multinationalize its management and, ultimately, multinationalize the ownership of its stock." Jacoby, The Multinational Corporation, in *The Multinational Enterprise in Transition*, 22 (A. Kapoor and P. Grub eds. 1972). While many thousands of corporations are at the first, export stage, only a handful have developed into advanced multinational enterprises each of whose elements can be said to be significant in its own right.

After World War II, foreign companies gained familiarity with the United States market "by first exporting to this country; then, after achieving acceptance for their products, foreign firms set up manufacturing or assembly plants here." U.S. Department of Commerce, *Foreign Direct Investment in the United States*, 100 (1976). As these later stages were reached, the businesses established came to have lives of their own. The "monocentric" enterprise gradually gave way to a polycentric one, with more autonomy in the different elements. Wilkins detects three stages: in the first stage, the firm "reached out to sell or to obtain and in doing so felt the necessity

or saw the opportunity to cross over domestic boundaries." M. Wilkins, *The Maturing of Multinational Enterprise: American Business Abroad from 1914 to 1970,* 416 (1974). The relationship was "monocentric" with the center of operations clearly in the parent's home country. The external activities in a monocentric relationship were "spokes on a wheel, with the parent company at the hub." *Id.* In stage two, the functions of the branches broadened. There might, for example, be investment by the subsidiary in a plant for local production or the subsidiary might sell products in third-country markets. "What characterizes stage two is the presence of foreign units that have developed their own separate histories and their own satellite activities." *Id.* at 417. The final, third, stage is characteristic of the most advanced of these entities:

> It garbles any chart's attempt to delineate international trade and control lines. The parent company comes to have a number of foreign multifunctional centers, serving overlapping geographical areas with various products. Supply and market lines cross international boundaries in . . . chaotic confusion. . . .

*Id.* at 419.

> Over time, certain foreign subsidiaries and affiliates have become full-fledged, fully integrated, multiprocess, multiproduct enterprises, with engineering, product planning and research staffs, with a continuity of employee, supplier, dealer, consumer and banking relationships, with their own prominent role in foreign industries, with their own dealings with foreign governments and with their own third-country investments.

*Id.* at 420–421. At this final stage, complicated, many-faceted relationships have replaced simple bilateral connections. *Id.* at 421.

### 3. *Japanese Multinationals in General*

Hattori, like many Japanese export-based multinationals, remains in large part a monocentric organization so far as involves the United States. It is only in the past decade that Japanese firms have invested in manufacturing and other non-marketing invest-

ments in this country. M. Yoshino, *Japan's Multinational Enterprises,* 1 (1976); R. Tindall, *Multinational Enterprises,* 36 (1972) ("prior to 1970 there was little talk about Japanese companies as multinational enterprises"). This relative lateness results from several causes.

Although in the 1930s Japan began to develop a thriving trade in Asia and ranked fourth worldwide in volume of export, G. Allen, *Japan's Economic Expansion,* 227 (1965), the Second World War crippled Japan's foreign trade. It was the late 1950s before pre-war trade levels were again attained. *Id.* at 233. *See, also,* P. Buckley and M. Casson, *The Future of the Multinational Enterprises,* 7 (1976) (graphic representation of the date of establishment of Japanese-owned subsidiaries).

Another reason that the Japanese multinationals have been monocentric in focus is that they were the great Zaibatsu trading companies that traditionally functioned as commission distributors of merchandise. It was only in the 1960s that the large Japanese manufacturers first began to market their own products. K. Haitani, *The Japanese Economic System: An Institutional Overview,* 129 (1976). Foreign direct investment by Japan in the West was historically late in coming and was generally restricted to sales and marketing activities. *See* U.S. Department of Commerce, *Foreign Direct Investment in the United States,* 109 (1976) (Japan's success in exporting to the United States obviated need to make direct investments except in sales facilities).

The boom in Japanese exports after the post-World War II recovery brought with it the incorporation of hundreds of sales subsidiaries abroad. Whereas prior to the War exports to the United States were largely commodities such as silk, tea, fish and textiles, after the Japanese recovery exports included highly sophisticated manufactured goods. G. Allen, *Japan's Economic Expansion,* 236 (1965). These goods needed the kind of marketing and service apparatus that the huge trading companies were not able to provide. M. Yoshino, *Japan's Multi-*

*national Enterprises,* 118 (1976). As a result, between 1952 and 1973, fifty leading firms dealing in automobiles, motorcycles, electrical machinery, precision instruments, non-electrical machinery and other products established over three hundred sales subsidiaries in major export markets to perform marketing and technical tasks. In view of the requirement for close control over marketing and technical activities as well as for frequent communication between the local unit and headquarters it is not surprising that nearly 71% of these subsidiaries were wholly-owned. *Id.* at 19. Activities of these Japanese-controlled sales and marketing affiliates accounted for approximately ten billion dollars of trade between the United States and Japan in 1974. U.S. Department of Commerce, *Foreign Direct Investment in the United States,* 39 (1976). Japanese exports to the United States in calendar year 1979 were well over twenty-six billion dollars and they continued to increase in 1980. United States Department of Commerce Statistics.

While sales and marketing subsidiaries generally are more likely to be controlled by the parent and less likely to develop lives of their own than those involved in manufacturing, Japanese subsidiaries in particular may be singularly responsive to the wishes of their parent companies. Defendants draw the court's attention to cultural differences that distinguish the multinationals of different parent countries. Defendants' Memorandum in Relation to the Motion to Dismiss at 20–23. They contend that the Japanese preference for minority equity positions in direct foreign investment indicates loose control by Japanese parents of their subsidiaries. *Id.* at 20. *See, also,* M. Duerr and J. Roach, *Organization and Control of International Operations* 125 (1975). This argument as to Japanese preference for minority ownership of subsidiaries cuts against defendants' position, since sales subsidiaries generally, and Hattori's sales and marketing subsidiaries in particular, are wholly-owned. On defendants' view of the matter this would presumably speak for a desire to maintain even greater control than would usually be the case.

### 4. *Japanese Hierarchical Structures*

Significant in terms of cultural considerations that seem to affect real economic power relationships relevant to jurisdiction is the widely-noted hierarchical structure that joins the Japanese subsidiary to its parent, and the Japanese employee to his or her employer. In Japan subsidiaries are commonly referred to as ko-gaisha (child company) in relation to oya-gaisha (parent). "The use of the words 'parent' and 'child' suggests the existence of a familial relationship of control and dependency." K. Haitani, *The Japanese Economic System: An Institutional Overview,* 126 (1976); *see, also,* M. Yoshino, *Japan's Multinational Enterprises,* 169 (1976) (tendency of parent to impose its will on subsidiary because of strong Japanese sense of hierarchy); R. Tindall, *Multinational Enterprises,* 38 ff. (1972) (description of parent-subsidiary relations among Mitsubishi group of companies). Thus, quite apart from the matter of one hundred percent stock ownership, a Japanese parent may expect to exert control over any of its child companies.

The sense of hierarchy is apparently to be found in typical employee-employer relations as well. An inferior in Japanese social organization is "conditioned to attribute authority to the wishes of his superior . . . . The subordinate is extremely conscious of his standing in the group." K. Haitani, *The Japanese Economic System: An Institutional Overview,* 92 (1976). Although the precise systems of control may differ from those found in Western organizations, Defendants' Memorandum in Relation to the Motion to Dismiss at 21, this cannot mean that control is any the less pervasive.

Those reared in the tradition of American corporate culture cannot help wondering how Japanese organizations maintain their vigor and productivity in the absence of a formal control mechanism and an explicit system of performance evaluation supported by immediate financial reward. The answer is that the Japanese corporation relies on—and consciously fosters—emotional commitment to the organization by the employee at every level.

M. Yoshino, *Japan's Multinational Enterprises*, 166 (1976). Decision-making is often done on a group basis; this strengthens, not weakens, the sense of employee loyalty to his employer. *See, generally,* E. Vogel, *Japan as Number One*, 146 (1979). Decision-making is also apparently widely diffused, rather than decentralized, throughout the organization. M. Yoshino, *Japan's Managerial System: Tradition and Innovation*, 258 (1968).

The Japanese corporate employer reinforces the loyalty of its employees by the "implicit guarantee of lifetime security;" this ensures not only his technical and professional loyalty, "but more important, his emotional tie to the firm." M. Yoshino, *Japan's Multinational Enterprises*, 163 (1976). Under the *shukko* system, an employee may be assigned to another employer or to a subsidiary. While on external assignment the employee keeps his "security in, and identity with" his original employer. K. Haitani, *The Japanese Economic System: An Institutional Overview*, 46 (1976). Thus, for example, new government agencies in Japan may be staffed with employees of another agency. However, "until the homegrown careermen rise through the ranks, the key positions in the new agency are monopolized by the *shukko* 'colonists' and the agency is subjected to external controls exerted through them." *Id.* at 46–47.

### 5. *Application of Law to Facts*

■ Moving defendants place great stock in the formal separation of Hattori from its 100% directly-owned subsidiary and its 100% indirectly-owned subsidiaries. They state that the subsidiaries do not receive loans from the parent, Moriya Affidavit of May 13, 1980 at ¶ 3(b), that they generally buy from the parent by letter of credit posted with a Japanese bank abroad, *Id.* at ¶ 3(d), that they do their own advertising (although at times they participate in promotions organized by Hattori), *Id.* at ¶ 3(f), and that the parent has no bank account, office or phone listing in New York, is not licensed to do business here, *Id.* at ¶ 3(i), does not assign its "salaried employees" to New York, *Id.* at ¶ 3(h), and is not involved in the personnel policies or the hiring of personnel by its New York subsidiaries. *Id.* at ¶ 3(g).

Plaintiff, on the other hand, points to the complete stock ownership by the parent and additionally draws our attention to the interchange and overlap of directors and officers between parent and subsidiaries, Exhibit 2 to Codraro Affidavit, to the fact that intercompany loans are made to other Hattori subsidiaries and are assertedly available, if needed, to the New York subsidiaries, Plaintiff's Supplemental Memorandum at 4, that the financial statements of the New York subsidiaries are consolidated in Hattori's reports filed under the securities and exchange law of Japan, and that unrealized profits and losses arising from sales among the consolidated companies are eliminated in the financial statements. *Id.* at 6. It also relies upon certain advertising materials produced by Hattori and distributed by the public relations firm of the New York subsidiaries that refer to Hattori's "marketing offices in . . . New York" and an "international network of designated distributors . . . supervised by the Tokyo headquarters." Plaintiff's Memorandum in Opposition at 4–5.

It would be helpful were the law to provide some grand jurisdictional ledger sheets upon which formal points such as these could be assigned weights and totted up. That is not possible in our real world where so much depends on nuances, on a sense of interrelationships and on a realistic appraisal of subtle economic and power connections. Real rather than formal relationships must be considered. *Boryk v. deHavilland Aircraft Co.,* 341 F.2d 666, 669 (2d Cir. 1965).

It is apparent that Hattori's international activities, large as they may be in terms of sales figures and associated product lines, are essentially akin to Wilkins' stage one "monocentric" export model and not to the much more complex multinationals to which defendants point. What is involved here is a series of relatively young sales and marketing subsidiaries abroad, whose purpose is to market a single product—timepieces. There is no manufacturing or product re-

search done by any of these subsidiaries. They do not seem to have developed third-country trade except for the purpose of selling Hattori's Japanese manufactured goods. Only very recently have they begun to make some investments in third countries, again to produce further outlets for Hattori's factories in Japan. The use of the wholly-owned subsidiary form here reflects the desire for "unambiguous control" over sales and marketing subsidiaries to insure uniform quality and promotion of the product sold. J. Stopford and L. Wells, Jr., *Managing the Multinational Enterprise: Organization of the Firm and Ownership of Subsidiaries*, 107, 111 (1972); *see* Moriya Deposition at 62–69 (policy of Hattori to have service centers worldwide for its products).

Hattori and its American subsidiaries do maintain some independence—about as much as the egg and vegetables in a western omelette. Just as, from a culinary point of view, we focus on the ultimate omelette and not its ingredients, so, too, from a jurisdictional standpoint, it is the integrated international operation of Hattori affecting activities in New York that is the primary focus of our concern.

Although with time the Hattori subsidiaries might well evolve, along with their parent, into the later stages of multinational development, today Hattori is a highly effective export manufacturer and not a fully developed multinational. It is monocentric more than polycentric. Large and sophisticated as it may be, it is very much the hub of a wheel with many spokes. It is appropriate, therefore, to look to the center of the wheel in Japan when the spokes violate substantive rights in other countries.

Defendant would have the court accept the notion that none of Moriya's work was done for the benefit of Hattori. The metaphoric fiction by which the parent and child corporation are treated as separate is here carried too far. "Metaphors in the law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." *Berkey v. Third Avenue Railway Co.*, 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926), *rehearing denied*, 244 N.Y. 602, 155 N.E. 914 (1927) (Cardozo, J.) ("problem of the relation between parent and subsidiary corporation is one that

is still enveloped in the mists of metaphor"). There are ample grounds to find that plaintiff has made a case that the actions taken by a man adept and experienced in the American market for the specific purpose of expanding significantly Hattori's presence in its major overseas market were undertaken on behalf of Hattori. The fact that Moriya retained prominent titles in Hattori while in New York is significant, although not in itself decisive. So, too, is the fact that at the time of the filing of this complaint, after he had returned to Japan and supposedly severed all his New York connections, Moriya continued as chairman of SCA, chairman of Seiko Time, sole director of SPD Precision and Pulsar and president of SCA until sometime in November, 1979. Exhibit 2 to Codraro Affidavit. *See Top Form Mills v. Sociedad Nationale Ind., Etc.*, 428 F.Supp. 1237, 1246, n.12 (S.D.N.Y.1977) (reference point for determining corporate presence by virtue of "doing business" in New York is the time of the commencement of the action); *see, also, Propulsion Systems v. Avondale Shipyards, Inc.*, 77 Misc.2d 259, 352 N.Y.S.2d 749 (Sup.Ct.N.Y.Co.1973).

What is decisive is that at the time this complaint was filed, Hattori, through its American subsidiaries, continued to engage in the market penetration and expansion that are its corporate *raison d'être* and that are the grounds underlying this action. We have no doubt about the validity of an "inference as to the broad scope of the agency" linking Hattori to the activities of its subsidiaries in New York. *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533, 538, 281 N.Y.S.2d 41, 45, 227 N.E.2d 851, 854 (1967).

Defendants deny that the subsidiaries meet either the "mere department" or the "agency" test. As to the former, first set forth in *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), defendants seek to distinguish the case by stating that the parent in *Taca* "controlled" the subsidiary whereas here Hattori does not, and that "important policies" were made by the parent in *Taca*, but by the

subsidiaries here. 15 N.Y.2d at 101, 256 N.Y.2d at 131, 204 N.E.2d at 331. Suffice it to say that to accept these as distinctions is to beg the jurisdictional question. For what we are deciding is precisely whether or not Hattori controlled its subsidiaries and whether the truly important policies were made, on the one hand, in New York, or, on the other, in Tokyo or in New York on behalf of Tokyo.

Whether or not the court would pierce the corporate veil and impose liability on the parent for activities of the subsidiary is not the issue here. *See Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 530 (S.D.N.Y.1972); Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Calif.L.Rev. 12, 14 (1925); Wellborn, Subsidiary Corporations in New York: When is Mere Ownership Enough to Establish Jurisdiction Over the Parent, 22 Buffalo L.Rev. 681, 686 (1973) ("equating (1) liability of the parent for acts of the subsidiary with (2) whether a court should require the citizens of its state to go to the jurisdiction of the parent for their day in court, is most unreasonable."); *cf. Cannon Mfg. Co. v. Cudahy Co.,* 267 U.S. 333, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925) (suggesting distinctness of parent's liability from parent's amenability to suit).

The leading "agency" case in New York, *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), involved the question of whether a hotel company was doing business in New York by virtue of its reservation system operated in the state by an affiliated corporation. The test developed there would find jurisdiction if the subsidiary was doing "all the business which the [principal] could do were it here by its own officials." 19 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854. In this case, it is obvious that if the subsidiaries were not in New York and Hattori sought to enter the American market it would have to do so directly. This market is simply too important to the parent's welfare to use independent and uncontrolled sales agents and distributors as it does in some countries where sales are relatively small. There are undoubtedly special reasons Hattori has chosen to operate in this country by means of

incorporated subsidiaries. But these subsidiaries almost by definition are doing for their parent what their parent would otherwise have to do on its own. The question to ask is not whether the American subsidiaries can formally accept orders for their parent, but rather whether, in the truest sense, the subsidiaries' presence substitutes for the presence of the parent.

The parties have cited no cases based on New York law in which a court declined jurisdiction in a case such as the one at bar. In *Tokyo Boeki (U.S.A.), Inc. v. SS Navarino,* 324 F.Supp. 361 (S.D.N.Y.1971), jurisdiction was sustained over the Japanese parent of a wholly-owned New York sales subsidiary. The corporations observed a strict formal separation, but the parent derived the benefit of the subsidiary's profits and exchanged documents and communications with the subsidiary. There was interchange of personnel between the Japanese and New York companies and an overlap of directors and officers. Even though the New York subsidiary handled only 20 per cent of the parent's American sales, Judge Lasker had no difficulty in finding that the New York subsidiary was "both, in practical effect, the same entity as Boeki Japan for some purposes and its agent for other purposes." 324 F.Supp. at 366. The court apparently relied on the fact that the parent was interested in the specific transaction out of which the cause of action arose. *Id.*

The relation of parent and subsidiary in this case is considerably firmer than it was in *Tokyo Boeki.* Here the entire American sales of Hattori's production (except for a relatively small amount leaking in from third countries) moves through the American subsidiaries. Moriya Affidavit of November 30, 1979 at ¶ 6. Moreover, as in *Tokyo Boeki,* the parent was directly involved in the broad transactions out of which the cause of action arose.

The two New York-based cases upon which defendants rely simply highlight the unique distinguishing facts which justify jurisdiction in this case. *Saraceno v. S.C. Johnson & Son, Inc.,* 83 F.R.D. 65 (S.D.N.Y. 1979) (*Saraceno I*), was an action brought

by a New York resident who had purchased in Spain a can of pesticide that subsequently exploded. The can had been manufactured outside New York by the Dutch subsidiary of a Wisconsin company licensed to do business in New York. Plaintiff urged that the court find jurisdiction on both "agency" and "mere department" grounds. The court rejected both arguments. While the plaintiff contended there that the American parent was its subsidiary's agent in New York, the court indicated that there could be no New York agency because the Dutch subsidiary sold its products not to New York but to the European and Asian markets. *Saraceno* thus involved a manufacturing, not a sales subsidiary, which sold to other markets, not to New York. There was no ground shown for presence on an "agency" theory.

Hattori is not the kind of multinational enterprise described in *Saraceno*. Johnson's foreign subsidiary was a manufacturing unit engaged in third-country sales. The court acutely noted that the subsidiary was a "European corporation with little contact in New York." 83 F.R.D. at 68. In fact, a sequel to *Saraceno* held that the Dutch subsidiary did not have sufficient New York contacts even to satisfy the minimum requirements of due process. *Saraceno v. S.C. Johnson & Son, Inc.*, 492 F.Supp. 979, 986–987 (S.D.N.Y.1980) (*Saraceno II*). *See Intermeat, Inc. v. American Poultry, Inc.*, 575 F.2d 1017, 1022 (2d Cir. 1978) (contacts required to establish doing business under N.Y. CPLR 301 more substantial than due process requires). Thus, *Saraceno I* is irrelevant to our case.

Nor is *Saraceno I* authority for defendants' contention that "day-to-day control" of operations is a *sine qua non* for the finding that a subsidiary is merely the incorporated department of its parent. Defendants' Reply Memorandum at 8. A foreign manufacturing subsidiary selling entirely to its own market and to third countries will obviously have more of a life of its own than a wholly-owned sales and marketing subsidiary. *See, generally*, M. Wilkins, *The Maturing of the Multinational Enterprise: American Business Abroad from 1914 to 1970*, 416 ff. (1974). As indicated

above, different control relationships inhere in different multinational structures, and we lose sight of the economic realities if we insist on masking these distinctions behind simplistic formulae. The kind of "day-to-day control", to the extent such a nebulous concept can be made concrete, will vary depending on the kind of subsidiary involved. Thus, while "day-to-day control" might be required to attribute the activities of a relatively autonomous manufacturing subsidiary to its conglomerate parent, this by no means implies such a requirement as to a wholly-owned sales and marketing subsidiary which is the conduit for the sales of a single product in the New York market.

*Marantis v. Dolphin Aviation, Inc.*, 453 F.Supp. 803 (S.D.N.Y.1978), likewise does not control this case. That action was brought against an out-of-state aircraft manufacturer by the estate of a person killed in a crash. The manufacturer's only contact with New York was through a wholly-owned subsidiary that sold the manufacturer's products in New York. There was an overlap of directors and officers, and the parent filed consolidated financial statements. Although the subsidiary was only one of seven distributors in New York (all the rest were completely independent of the manufacturer) and although the subsidiary could not have accounted for more than one-third of the manufacturer's New York sales, the court found this arrangement to "fall just short of that corporate intimacy which has led to 'mere department' holdings." 453 F.Supp. at 805.

In distinguishing *Frummer*, the court in *Marantis* pointed especially to

the role [the New York subsidiary] plays in [the manufacturer-parent's] organizational life: other than selling [the parent's] products, an enterprise engaged in by independent retailers as well, [the New York subsidiary] does not perform any service for [the parent] which the latter would be required to perform for itself within the state. It is not [the parent's] agent within the meaning of *Frummer*.

453 F.Supp. at 807.

The contrast with the role of Hattori's New York subsidiaries is substantial. The

significance of those subsidiaries in Hattori's "organizational life" is enormous. *Id.* The export market is crucial for Hattori, accounting as of March, 1979 for 60% of its production. *K. Hattori & Co., Ltd., Business Report of the 118th Term for the Year Ended March 31, 1979*, Exhibit 3 to Defendants' Memorandum in Relation to the Motion to Dismiss. The New York subsidiaries are the means by which Hattori has established and seeks to maintain its base in the country that is its single largest export market. Moriya Affidavit of May 13, 1980 at ¶ 15. The subsidiaries do for the parent everything that the parent would have to do if it were here directly: if the New York subsidiaries did not advertise Hattori's products, *Id.* at ¶ 3(f), Hattori would; if the New York subsidiaries did not provide service quality control centers, Hattori would, *see* Moriya Deposition at 104, and if the subsidiaries did not develop the marketing techniques to penetrate and expand their share of the American market, Hattori would.

What the Hattori subsidiaries have done is a far cry from "mere solicitation." *See Miller v. Surf Properties, Inc.*, 4 N.Y.2d 475, 480, 176 N.Y.S.2d 318, 321, 151 N.E.2d 874, 876 (1958). To establish marketing and service networks and to formulate and implement distribution systems in the largest export market of a billion dollar company is not "mere solicitation of sales." In any case, once solicitation is found in any substantial degree, "very little more" is necessary to support a conclusion of doing business through the in-state agent. *Aquascutum of London, Inc. v. S.S. American Champion*, 426 F.2d 205, 211 (2d Cir. 1970). There is sufficient evidence at this preliminary stage to support plaintiff's contention that conscious and systematic activities undertaken by Hattori to establish, consolidate and expand a vital market position, satisfy the "very little more" test. *See Sanders v. Wiltemp Corp.*, 465 F.Supp. 71, 73 (S.D.N.Y.1979) (how much more is "very little more" is a question of fact in each case). Hattori is informed of all activities undertaken by its American subsidiaries which may have any substantial impact on this critical American market. Memorandum of Hattori, January 21, 1981 at 25.

Our holding that the activities of Hattori's subsidiaries allow the court to take jurisdiction of Hattori is buttressed by the fact that the cause of action alleged here is integrally related to the doing of business by Hattori within the state. In *SCM Corporation v. Brother International Corporation*, 316 F.Supp. 1328 (S.D.N.Y.1970), the court considered whether it had personal jurisdiction of a New York subsidiary of a Japanese parent in a patent infringement case. The court noted the "intimate nature of the relationship" among the affiliated companies, *id.* at 1332, and concluded that these relations justified jurisdiction "especially since the underlying action arises out of and is closely connected with [the] conduct and activity" justifying jurisdiction. *Id.* at 1334. *See, also, Tokyo Boeki (U.S.A.), Inc. v. SS Navarino*, 324 F.Supp. 361 (S.D.N.Y.1971) (defendant foreign parent's involvement in the activity out of which the cause of action arose was noted by court as factor in its determination that parent was doing business in New York). It is often said that when a corporation does business in New York, "jurisdiction does not fail because the cause of action sued upon has no relation in its origin to the business here transacted." *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 268, 115 N.E. 915, 917 (1917); *see, e. g., Beja v. Jahangiri*, 453 F.2d 959, 962–963 (2d Cir. 1972); *Erving v. Virginia Squires Basketball Club*, 349 F.Supp. 709, 712 (E.D.N.Y.1972). Nevertheless, in practice, the cases do reflect judicial weighing of the local agent's participation in the actions surrounding the complaint as a factor strengthening the doing business basis of jurisdiction.

A court might well find substantial unfairness were it to drag a foreign parent into court to defend itself against actions completely unrelated to the subsidiary corporation's purposive activities on behalf of its parent. The holding in this case is simply that while a subsidiary establishes and expands a parent's market position then, so long as that activity is being conducted, and with respect to those activities furthering

the parent's ends, the parent is doing business in New York. This is particularly true as to activities directly related to primary steps taken to ensure a place for its subsidiaries, as where action is taken to raid an established competitor's personnel in penetrating the American market.

### B. *Long Arm Jurisdiction, N.Y. CPLR 302*

#### 1. *The Law*

Plaintiff has also made a sufficient jurisdictional showing to support personal jurisdiction over Hattori under CPLR 302. That provision allows the exercise of jurisdiction over a non-domiciliary where the defendant either commits a tortious act within the state or commits a tortious act outside the state and has substantial contacts with the state. It covers a foreign entity which,

> (a) . . . in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ; or (3) commits a tortious act without the state causing injury to person or property within the state, . . . if [it] (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce. . . .

Jurisdiction is granted only "[a]s to a cause of action arising from any of the acts enumerated in th[e] section." N.Y. CPLR 302(a).

■ Generally, a holding that a non-domiciliary is "doing business" in New York implies the less pervasive finding that he "transacts business" in New York for purposes of CPLR 302. *Traub v. Robertson-American Corporation*, 368 N.Y.S.2d 958, 961, 82 Misc.2d 222 (Sup.Ct. Nassau Co. 1975). Doing business is to transacting business what a full length mink coat is to tennis shorts. A "single transaction in New York" would satisfy the requirement of purposeful activity necessary for a finding of transacting business. *Longines-Witt-*

*nauer Co. v. Barnes Reinecke*, 15 N.Y.2d 443, 456, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75, cert. denied, 382 U.S. 905, 96 S.Ct. 241, 15 L.Ed.2d 158 (1965). Establishing and expanding presence in New York markets, by hiring personnel, forming new divisions and corporate subsidiaries and formulating and implementing marketing strategies—constitute "purposeful activity in this State in connection with the matter in suit." *Id.* Acquisition and continuing ownership of a subsidiary with an infringing name would, for example, constitute transacting business under a long-arm statute. *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 420 (9th Cir. 1977). That a tort is charged as a result of the business transacted thus does not alter the fact that the activities constituted purposeful business transactions. *See East New York Sav. Bank v. Republic Rlty. Mtg.*, 61 A.D.2d 1001, 1002, 402 N.Y.S.2d 639, 641 (2d Dep't 1978).

■ For purposes of CPLR 302 a foreign principal may transact business through its agent, a subsidiary. A "formal agency relationship is not necessary to impute activity against the defendant when he is being sued by a third party." *Galgay v. Bulletin Company, Inc.*, 504 F.2d 1062, 1065 (2d Cir. 1974); *Elman v. Belson*, 32 A.D.2d 422, 302 N.Y.S.2d 961 (2d Dep't 1969); *Legros v. Irving*, 77 Misc.2d 497, 354 N.Y.S.2d 47 (Sup.Ct.N.Y.Co.1973). "The formal trappings of agency are not as important as the realities of the situation." *Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385, 390 (S.D.N.Y.1978); *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 617, n. 2 (W.D.N.Y.1977).

■ The ambit of CPLR 302 includes not only physical but commercial torts, and a tort is committed where an employee is hired with the intention of obtaining trade secrets. *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 203, 413 N.Y.S.2d 127, 130, 385 N.E.2d 1055, 1057–1058 (1978). Generally, the activities of an agent will be attributed to the principal if it "requested the performance of those activities in New York, and those activities benefit it." *East New York Sav. Bank v. Republic Rlty. Mtg.*, 61 A.D. 2d 1001, 1002, 402 N.Y.S.2d 639, 641 (2d

Dep't 1978) (jurisdiction sustained where independent contractor transacted business and committed business tort). In determining whether the cause of action arose out of these activities, the entire transaction must be considered. *Id.*

To satisfy the condition that the injury be reasonably expected to have consequences in New York, it is not sufficient that the place of business or incorporation of the plaintiff be New York. *Fantis Foods, Inc. v. Standard Importing*, 49 N.Y.2d 317, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122, 126 (1980). New York must be the place where the plaintiff actually lost business. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897 (2d Cir. 1980); *Spectacular Promotions, Inc. v. Radio Station WING*, 272 F.Supp. 734, 737 (E.D.N.Y.1967).

### 2. *Application of Law to Facts*

Quite aside from our findings with respect to CPLR 301, Hattori transacts business in New York. The cause of action arises out of the actions of the New York subsidiaries in New York on behalf of Hattori.

Defendants contend that plaintiff's claims do not actually relate to the establishment of the Pulsar division, Pulsar Time, Inc. and the Seiko clock sales operation. Defendants' Reply Memorandum at 14–15. It seems clear, however, that the gravamen of the complaint is precisely the tortious conduct that is alleged to have occurred just in order that these businesses could be successfully established in New York. Codraro Affidavit at ¶ 19.

The more important question is whether the actions of the New York subsidiaries can be attributed to Hattori under an agency theory as the statute seems to require. Here, as in the case of CPLR 301, courts look to the realities rather than the formalities of agency to decide whether business has been transacted through an agent.

Defendants point to Judge Weinfeld's formulation of the rule that "to constitute an agent for purposes of § 302 the alleged agent must have acted in this state for the benefit of, and with the knowledge and consent of the non-resident and the non-resident must exercise some element of control over the agent." *Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385, 390 (S.D.N.Y.1978). Hattori contends that on this test there is no agency linking it to its subsidiaries because it claims that no one in New York consulted Hattori about the employment of the specific Bulova personnel actually interviewed and hired. Defendants' Reply Memorandum at 16.

Defendants' argument misses the mark. Even were we to grant that a stronger showing of agency is required to establish jurisdiction under CPLR 302 than 301—an inclination we do not have—and even assuming that Hattori was not involved with the decision to select top management of a leading competitor in the American market, and even assuming further that Moriya was not acting in his role as the manager of Hattori's international department when he made two of the hirings and met with other former Bulova employees, Hattori was informed by Moriya of the establishment of the Pulsar Time subsidiary in January, 1979. Moriya Deposition at 144–148. Hattori was kept so advised even though SCA, and not Hattori, was Pulsar Time's sole shareholder. It is conceded also that Hattori gave its approval to the election of Moriya as sole director of Pulsar, again, despite the fact that Moriya, as president of SCA, Pulsar Time's sole shareholder, needed no such approval. If, as Hattori suggests, Moriya spoke to Tokyo only five times a year and submitted only quarterly written reports to Hattori's board, Moriya Affidavit of May 13, 1980 at ¶ 5, it would defy good sense to believe that the purchase of the Pulsar trademark in September, 1978 and the decision to market Pulsar watches by January, 1979 by means of a new direct marketing system, would not have been the subject of conversations with Tokyo. This is especially so in light of Moriya's testimony of his close cooperation with Reijiro Hattori in deciding upon the innovative distributor system that put Seiko on the American map in 1969. Moriya Deposition at 160–163. Planning and establishing significant new product lines

and implementing a marketing strategy that entailed the hiring of established salespeople constitute the transaction of business out of which the present complaint arises. As to this business there is a strong showing that Hattori was informed. When actions of relatively minor significance might subject a foreign party to the jurisdiction of a New York court, it would be anomalous if the systematic and sustained planning for establishing and expanding the New York business of a billion dollar multinational could not. There is jurisdiction under CPLR 302(a)(1).

Similar considerations support finding jurisdiction over Hattori under CPLR 302(a)(2) as well. Plaintiff alleges that Hattori, through Moriya, committed in New York the torts of unfair competition and disparagement and inducing breach of fiduciary duty. While Hattori denies any role in the contested hirings, Moriya Affidavit of May 13, 1980 at ¶¶ 3(g), (9) and (10), there is substantial evidence that if there was a tort, substantial tortious acts took place in New York.

Plaintiff also bases jurisdiction on CPLR 302(a)(3)(i) and (ii), alleging that Reijiro Hattori, Chairman of SCA during the period in question and second in command at Hattori, acting from Tokyo, instigated, controlled and supervised Moriya's tortious conduct in New York. Plaintiff's Memorandum in Opposition at 34. Since we have found that this court has jurisdiction under CPLR 301, 302(a)(1) and 302(a)(2), it is not necessary to decide whether plaintiffs have made a case for jurisdiction over Hattori solely on the basis of Hattori's Japanese activities.

## IV. JURISDICTION OVER INDIVIDUAL DEFENDANTS

### A. *The Law*

Under the "fiduciary shield" doctrine, the acts of a corporate officer or employee taken in his corporate capacity within the jurisdiction generally do not form the predicate for jurisdiction over him in his individual capacity. *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87,

92–93 (2d Cir. 1975); *Grove Press, Inc. v. Central Intelligence Agency*, 483 F.Supp. 132, 135 (S.D.N.Y.1980); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385, 389 (S.D.N.Y.1978).

Under New York law conspiracy in itself does not constitute a tort. *Louis Marx & Co. v. Fuji Seiko Co., Ltd.*, 453 F.Supp. 385, 392 (S.D.N.Y.1978). Although under certain circumstances the acts of a co-conspirator within New York may give rise to jurisdiction over a co-conspirator in another state, *American Broadcasting Co., Inc. v. Hernreich*, 40 A.D.2d 800, 338 N.Y.S.2d 146 (1st Dep't 1972); *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 617 (W.D. N.Y.1977), the bland allegation of conspiracy without a *prima facie* showing of its existence, is insufficient to establish jurisdiction for the purpose of section 302(a)(2). *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975). Although one court has stated in dictum that the fiduciary shield should not protect individuals who commit business torts on behalf of their corporate employers, *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 619 (W.D.N.Y.1977) (holding that plaintiff failed to show tortious acts were committed in New York), we prefer in the particular circumstances of the instant case to follow the contrary holding of Chief Judge Mishler in *Fashion Two Twenty, Inc. v. Steinberg*, 339 F.Supp. 836, 841–842 (E.D. N.Y.1971) (no jurisdiction over individuals because commercial tort was committed by individuals as agents of corporation). *See, also, e. g., U. S. v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440, *rehearing denied*, 384 U.S. 982, 86 S.Ct. 1858, 16 L.Ed.2d 693 (1966); *Grove Press, Inc. v. Central Intelligence Agency*, 483 F.Supp. 132, 135 (S.D.N.Y.1980).

The constitutional principle underlying the exercise of long-arm jurisdiction is that there is

some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Where the corporate agent engages in corporate business for the sole benefit of the corporation, it is difficult to see how the exercise of jurisdiction over one who has conducted no activities on his own behalf "comports with fair play and substantial justice." *Merkel Associates, Inc. v. Bellofram Corp.,* 437 F.Supp. 612, 618 (W.D.N.Y. 1977).

As the term "fiduciary shield" suggests, this is an equitable doctrine. It should be followed not with mechanically but with a sound exercise of discretion. If, for example, the parent lacked sufficient assets to respond or if it were a shell utilized by an individual defendant for his own benefit, the balance of fairness might be tipped and jurisdiction over the individual might lie.

**B. *Application of Law to Facts***

Plaintiff's allegations of conspiracy seem designed to allow a jurisdictional net to draw in people distant in time and place from the core of the activity involved in this case. The sole question is whether Moriya, Segal, Waldman or Murphy have committed individual tortious acts within New York to support jurisdiction over them in their individual capacities under CPLR 302(a)(2). In determining lack of jurisdiction over them we do not preclude a finding of liability in a suit brought where they are physically located.

**1. *Segal***

 Segal was Bulova's regional manager in San Francisco. Since 1964 he has been a domiciliary of California. Segal Affidavit at ¶ 2. He has done no personal business in New York and has no personal contacts with the state. In July, 1978 he left Bulova to join Omichron, Inc., a California-based independent Seiko distributor. The affidavit of a Bulova salesman states that "in the fall of 1978" when Segal was an Omichron employee, he mentioned to the salesman that "some people will be leaving (Bulova) . . . and you will be surprised who they are." Pierce Affidavit at ¶ 2. In the spring of 1979 he allegedly told Pierce to contact Waldman if he was still interested

in joining Pulsar. *Id.* at ¶ 3. Another affidavit alleges that Segal mentioned that "my people are still interested in you," McGann Affidavit at ¶ 2, and alleges that "from reports I received from the field, it was apparent that Jason Segal was undermining Bulova constantly." *Id.* at ¶ 3.

We agree with defendant that such vague and indefinite allegations are a paltry substitute for the "definite evidentiary facts" needed "to connect the defendant with transactions occurring in New York." *Ghazoul v. International Management Services, Inc.,* 398 F.Supp. 307, 312 (S.D.N.Y. 1975), *quoting Socialist Workers Party v. Attorney General of U. S.,* 375 F.Supp. 318, 322 (S.D.N.Y.1974). Segal seems to be in this case only because he was apparently "the first Bulova regional sales manager to leave the company in order to join a competitor." Codraro Affidavit at ¶ 8. Plaintiff has failed to make a *"prima facie* showing of facts from which the finder of the facts could reasonably conclude that [Segal] was a conspirator and thereby participated in a New York based tort." *Ghazoul v. International Management Services, Inc.,* 398 F.Supp. 307, 314 (S.D.N.Y.1975).

**2. *Murphy***

 The motion with respect to Murphy also must be granted. Murphy resigned on October 26, 1978 from his position as Bulova's regional sales manager in Chicago. He joined TexChron, a Texas Seiko distributor. There is no allegation that Murphy met with Moriya or advised him on hirings. Murphy is in this case apparently because he left Bulova the same day that Cohen resigned from Bulova in New York. There is nothing to link Murphy to New York. He never lived in, or had personal business contacts of any sort with New York. His sole contacts with the state have been to attend meetings for Bulova or Seiko. Murphy Affidavit at ¶¶ 4, 5. He voluntarily left his Bulova position after contacting Tex-Chron. *Id.* It is nowhere alleged that he met Moriya or did any soliciting of Bulova employees. There is no reason for his being in this venue as a party.

Plaintiff's reliance on *Frederick Chusid & Co. v. Marshall Leeman & Co.*, 326 F.Supp. 1043, 1056 (S.D.N.Y.1971) for the proposition that Cohen's and Murphy's "virtually simultaneous resignations must have been by plan" is misplaced. That case, which involved a malicious attempt by employees of one organization to form a rival and to destroy their old employers' business, is not similar to our case where Hattori and its agents were allegedly the initiating parties. *Cf., also, Duane Jones Co., Inc. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1954) (wrongful formation of new rival); *McRoberts Protective Agcy. v. Lansdell Protective Agcy.*, 61 A.D.2d 652, 403 N.Y.S.2d 511 (1st Dep't 1978) (unfair competition where employees disloyally acted to aid rival newly created by former employee). That Murphy was made aware of Cohen's resignation before Murphy left Bulova, Cohen Deposition at 19, by no means entails conspiracy. Nor does the fact that Cohen's decision to leave may have had some bearing on Murphy's career decision. *Id.*

### 3. *Moriya*

■ We see no evidence of conspiracy with respect to persons like Segal and Murphy who had no contact with Moriya. Moriya himself acted in New York, but obviously did so on behalf of either SCA, Hattori or one of the three sub-subsidiaries. He should be protected by the fiduciary shield doctrine from having to come halfway around the world to defend a case which will in any event be defended by the party on whose behalf his actions were allegedly taken. In the case of Moriya, the unique burdens that would be imposed on the defendant, and our holding that the corporate employer is subject to our jurisdiction tip the balance decisively in favor of dismissal.

### 4. *Waldman*

■ Waldman has lived in Texas since 1949 and has never resided in New York. Waldman Affidavit of December 6, 1979 at ¶¶ 2, 3. His only contacts with New York before the events in issue were business visits while a Bulova employee. During the first week of December, 1978 he met in New York with Schwartz and Cohen, president and vice president of the nascent Pulsar operation. Codraro Affidavit at ¶ 19, Cohen Deposition at 56 ff. Subsequent to his accepting employment the following day with the Pulsar group, whatever activities he may have undertaken in recruiting salesmen together with Cohen and Schwartz were on behalf of his new employer. Cohen Deposition at 67–68. Co-employees of a corporation cannot normally conspire among themselves if the only connection is through their corporate employer's affairs. *Merkel Assoc., Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 618 (W.D.N.Y.1977); *Girard v. 94th St. and Fifth Avenue Corp.*, 530 F.2d 66, 70–71 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976).

As to the initial meeting during which Cohen, Schwartz and Waldman discussed plans for the new Pulsar division, Cohen testified at his deposition that there was mention of four Bulova salesmen who might be recruited. Cohen Deposition at 65. Waldman, however, insists that he has no recollection of discussing possible candidates until after formally accepting employment with Pulsar the next day. Waldman Affidavit of May 16, 1980 at ¶ 1. The meeting was predicated on the strong possibility that Waldman would be joining Pulsar, and he indicated as much at the start of the meeting. Cohen Deposition at 56.

Whatever decisions may have been taken at the meeting were for the benefit of Pulsar. Fairness militates against bringing this defendant to New York to defend against charges that only secondarily involve him.

### V. CONCLUSION

The case is dismissed for lack of personal jurisdiction against Segal, Murphy, Moriya and Waldman. In all other respects the motion is denied.

The court certifies to the Court of Appeals, pursuant to 28 U.S.C. § 1292(b), the denial of Hattori's motion to dismiss the action against it for lack of *in personam* jurisdiction since this order involves a controlling question of law as to which there is substantial ground for difference of opin-

**1350**

ion, and an immediate appeal from the order may materially advance the ultimate determination of the litigation. As a matter of fairness, and to avoid unnecessary retrial, the issue of dismissal for lack of personal jurisdiction of Segal, Murphy, Moriya and Waldman is also certified. Because the Court of Appeals has generally not permitted appeals upon such certifications and a delay in a decision on the merits is undesirable, no stay of proceedings in this court will be granted. Discovery on the merits shall be expedited.

So ordered.