SOLTEX POLYMER CORPORATION,
Plaintiff,

v.

FORTEX INDUSTRIES, INC., Fortiflex
Inc., Texamar Enterprises, Inc., Terri-
wood Corporation, Defendants.

FORTIFLEX INDUSTRIES, INC., Forti-
flex Inc., Counterclaim-Plaintiffs,

v.

SOLTEX POLYMER CORPORATION,
Solvay & Cie Societe Anonyme, Hedwin
Corporation, Jacques E. Solvay, Claude
Y. Loutrel, M. Whitson Sadler, Michel
Osterreith, P.J. Americo, Rene Degreve,
Maurice P. Fitzgerald, Edwin J. Buck-
ingham, III, Counterclaim-Defendants.

No. 81 CV 0673.

United States District Court,
E.D.N.Y.

June 20, 1984.

Levine, Lupo, Lipman & Lever, Washington, D.C. (R.V. Lupo and Jack Q. Lever, Jr., Washington, D.C., of counsel), for plaintiff Soltex Polymer Corp. and counterclaim-defendants Sadler, Osterreith, Americo, Degreve, Fitzgerald and Buckingham.

Carella, Byrne, Bain & Gilfillan, Newark, N.J. (John M. Bain and Richard E. Kummer, Newark, N.J., of counsel), for defendants.

Sullivan & Cromwell, New York City (William R. Norfolk, New York City, of counsel), for counterclaim-defendants Solvey et Cie, S.A., and Loutrel and Solvay.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

This is an action for trademark infringement and unfair competition. Plaintiff, Soltex Polymer Corporation ("Soltex"), alleges that defendants have infringed its trademarks FORTIFLEX and FORTILENE by use of the identical mark FORTIFLEX and the similar mark FORTILON.

According to the complaint, Soltex sells raw plastic materials under two general technical classifications: high density polyethylene and polypropylene. The former is sold under the FORTIFLEX trademark, and the latter under the FORTILENE mark. The complaint alleges that defendants have sold plastic products manufactured from raw plastic materials using the FORTIFLEX mark, and have sold various rubber and plastic materials under the allegedly confusing trademark FORTILON.

Defendants Fortex Industries, Inc. ("Fortex") and Fortiflex, Inc. ("Fortiflex") have filed counterclaims against Soltex and six of its officers and directors (Messrs. Sadler, Osterreith, Americo, Degreve, Fitzgerald and Buckingham). In addition, Fortex and Fortiflex have sought to join as counterclaim defendants, Solvay et Cie Societe Anonyme ("Solvay et Cie"), Soltex's Belgian parent corporation, and two principal officers of Solvay et Cie, who also sit

on the Soltex board of directors (Messrs. Solvay and Loutrel). A third corporation, the Hedwin Company, is also named as a counterclaim defendant. The counterclaims allege, *inter alia,* conspiracy, unfair competition, and violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"). All counterclaim defendants, except Soltex and the Hedwin Company, have moved to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction.

The motion was referred to Magistrate Shira A. Scheindlin, and on June 20, 1983 the Magistrate provided this Court with a Report and Recommendation that recommended dismissal of all counterclaims against the moving counterclaim defendants. Upon receipt of the Magistrate's Report and Recommendation, the counterclaim plaintiffs filed extensive objections, upon which I must now rule.

## I. Personal Jurisdiction Over The Eight Individual Counterclaim Defendants

### A. Factual Background

The individual counterclaim defendants include M. Whitson Sadler, President and Chief Executive Officer, and a member of the Board of Directors of Soltex; Michael Osterreith, former Vice President and currently a member of the Board of Directors of Soltex; P.J. Americo, Vice President and General Manager-Plastics of Soltex; Rene Degreve, Vice President of Soltex; Maurice P. Fitzgerald, Vice President of Soltex; Edwin J. Buckingham, III, General Counsel and Vice President of Soltex. Although these six individuals reside in the United States, they *do not reside in New York.* The two remaining counterclaim defendants are Jacques Solvay, Chairman of the Board of Directors of Solvay et Cie and a member of the Board of Directors of Soltex; and Claude Loutrel, a member of the Board of Directors of both Solvay and Soltex. Solvay is a citizen and a resident of Belgium. Loutrel is a citizen of France and a resident of Belgium.

In their affidavits, each of the six American counterclaim defendants has stated that he lives and works outside New York. They have further sworn that their sole employment compensation has been from Soltex since joining that company. In addition, each has sworn that he conducts no business of any kind in his own behalf, with the exception of Mr. Sadler who owns a farm in Texas. Although each defendant admits travelling to New York on Soltex business or for family or vacation visits, none maintains a New York office or place of business, mailing address, or telephone listing. None of the American counterclaim defendants owns any real property in this state. Furthermore, none of them is incorporated, licensed, or otherwise qualified to do business in the State of New York, with the exception of Mr. Buckingham, who was admitted to the Bar of the State of New York in 1973.

The two Belgian counterclaim defendants state that they live and work in Belgium, that they have never resided in New York, never maintained a New York mailing address or telephone listing, and never owned real property in New York. Moreover, they do not regularly conduct or transact business on their own behalf in New York either personally or through an agent.

### B. Counterclaim Plaintiffs' Argument

The counterclaim plaintiffs assert personal jurisdiction over the eight individual counterclaim defendants under both federal and state law. The federal predicate for personal jurisdiction is RICO (discussed *infra* at p. 1458), while the state predicate rests upon two theories.

#### 1. State Claims

The counterclaim plaintiffs argue that the individuals are subject to this Court's jurisdiction because they participated in a civil conspiracy in which at least one unlawful act was committed in New York. Thus, counterclaim plaintiffs allege that the individual co-conspirators are subject to *in personam* jurisdiction pursuant to N.Y.Civ. Prac.Law § 302(a)(2) (McKinney 1971), because each conspirator is liable for the acts of his co-conspirators. They also invoke

N.Y.Civ.Prac.Law § 302(a)(3) (McKinney 1971).

Fleshing out the conspiracy claim, the answer alleges that Soltex, Solvay et Cie, and their respective officers and directors participated in the following illegal acts: (1) filing the present lawsuit without probable cause; (2) intentionally providing misleading information to, or intentionally failing to correct misleading information in the possession of Standard & Poors concerning the ownership of the Hedwin Company; and, (3) perpetrating a fraud on the United States Patent and Trademark Office by (i) fraudulently renewing the trademark FORTILENE after abandonment of that trademark and the subsequent adoption by counterclaim plaintiff Fortex of the mark FORTILON, and (ii) instituting an opposition proceeding before the United States Patent and Trademark Trial and Appeal Board against the registration of the mark FORTIFLEX by the counterclaim plaintiff Fortex, after assuring Fortex that it did not consider Fortex's use of the mark on buckets and pails in the United States an infringement on Soltex's use of the mark on high density polyethylene.

In addition to the conspiracy theory, counterclaim plaintiffs charge that the individual defendants engaged in tortious conduct outside the state, causing injury to plaintiffs in New York, thereby establishing jurisdiction under N.Y.Civ.Prac.Law § 302(a)(3) (McKinney 1971). This charge is based on the alleged fraud on the United States Patent and Trademark Office. Counterclaim plaintiffs argue that counterclaim defendants engaged in this fraud by making false and fraudulent misstatements and omissions in connection with renewal of U.S. Registration 651, 021 for the trademark FORTILENE on or about November 15, 1977. Counterclaim plaintiffs contend that this fraud, as well as the alleged common-law conspiracy and the RICO conspiracy, are all tortious acts committed outside New York causing injury to this State. The injury is the $200,000 that the counterclaim plaintiffs incurred to defend the present lawsuit.

With respect to the remaining requirements of N.Y.Civ.Prac.Law § 302(a)(3), counterclaim plaintiffs rely on subsection (ii) which requires that the defendant have expected or reasonably should have expected his acts to have consequences in New York and that the defendant derives substantial revenue from interstate or international commerce. Counterclaim plaintiffs suggest that this requirement is met by the individual counterclaim defendants by reason of their membership in the conspiracy. The contention is that Soltex and Solvay et Cie derive substantial revenue from interstate or foreign commerce, and to the extent the individual counterclaim defendants are paid officers, directors, or employees of those corporations, they should likewise be deemed to derive such revenue.

Magistrate Scheindlin, in her Report and Recommendation, however, concluded that the fiduciary shield doctrine (as enunciated in *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899 (2d Cir.1981)) precludes exercise of personal jurisdiction over the individual counterclaim defendants. The Magistrate, accordingly, found it unnecessary to decide whether the counterclaim defendants had committed acts that would be sufficient to invoke long-arm jurisdiction under N.Y. CPLR § 302.

### C. Discussion

Personal jurisdiction is a composite notion of two separate ideas: amenability to jurisdiction, or predicate, and notice to the defendant through valid service of process. *DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264 (5th Cir.1983). "Amenability to jurisdiction means that a defendant is within the substantive reach of a forum's jurisdiction under applicable law. Service of process is simply the physical means by which that jurisdiction is asserted." *Id.* (citations omitted).

### 1. Predicate

#### a. N.Y.Civ.Prac.Law § 302

The acts of a conspirator may be attributed to a co-conspirator to obtain personal jurisdiction over the latter under

N.Y.Civ.Prac.Law § 302. *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 391 (S.D.N.Y.1978); *Ghazoul v. International Management Services Inc.,* 398 F.Supp. 307, 312 (S.D.N.Y.1975). Nevertheless, the mere allegation of conspiracy "does not suffice for purposes of the long arm statute." *Louis Marx & Co., supra,* 453 F.Supp. at 391. At a minimum, the plaintiff must allege specific facts that, if proven, would demonstrate the defendant's membership in the conspiracy. *Id.* Although counterclaim plaintiffs have had extensive discovery on the jurisdictional issue, they have been unable to adduce sufficient evidence of anything beyond the wildest speculation that the individual counterclaim defendants even knew of the conspiracy—much less were members of it.

■ Moreover, even if they had established a *prima facie* case of conspiracy for jurisdictional purposes, the fiduciary shield doctrine would, under the circumstances of this case, preclude the exercise of personal jurisdiction under § 302 over the eight individual counterclaim defendants.

In *Columbia Briargate Co. v. First National Bank in Dallas,* 713 F.2d 1052 (4th Cir.1983), the Fourth Circuit Court of Appeals traced the evolution of the fiduciary shield doctrine:

> This doctrine of 'fiduciary shield' ... emerged ... as a novel principle by way of dicta in a series of decisions of the New York state and federal courts in the mid-sixties .... Its source is generally identified as dictum in *Boas & Associates v. Vernier,* 22 A.D.2d 561, 563, 257 N.Y. S.2d 487, 490 (1st Dep't.1965). The first identification of the doctrine in the New York federal courts was in *United States v. Montreal Trust Company,* 358 F.2d 239 (2d Cir.1966), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440.

713 F.2d at 1055.

The Second Circuit's most recent exposition of the doctrine, however, is found in *Marine Midland Bank, N.A. v. Miller, supra,* 664 F.2d 899. There the court stated that:

> It is undisputed that an individual who commits a tort while acting in his capacity as a corporate officer or employee may be held personally liable .... At issue in this case is not whether such a person may be liable, but rather whether and when a person acting in New York in his capacity as a corporate employee may be subject to jurisdiction as an individual under the relevant provisions of the New York Long-Arm Statute.
>
> The teaching of the courts of this Circuit and of New York is that there is a dichotomy between the principles governing the personal liability of corporate agents for torts committed in their corporate roles and the principles governing amenability of such agents to personal jurisdiction solely on the basis of those acts .... [Cases in this Circuit] have recognized that if an individual has contact with a particular state only by virtue of his acts as a fiduciary of the corporation, he may be shielded from the exercise by that state of jurisdiction over him personally on the basis of that conduct. Thus, his conduct, although it may subject him to personal liability, may not form the predicate for the exercise of jurisdiction over him as an individual. The underpinning of this Fiduciary Shield Doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer.

*Id.,* at 902 (citations and footnotes omitted).

The question, then, is whether the individual counterclaim defendants' alleged conduct, which might otherwise subject them to personal liability, was engaged in solely in their capacities as fiduciaries of their corporations. Although they have conducted extensive discovery on this issue, the counterclaim plaintiffs—who have the burden of proof on the jurisdictional issue—have failed to demonstrate that any individual counterclaim defendant performed an act (that could conceivably give

rise to personal liability) in anything other than his corporate capacity.

■ There are, of course, exceptions to the fiduciary shield doctrine. For example, when the corporation for which the individual defendant purports to act is merely a shell he created to further his own personal interests, he may not invoke the fiduciary shield doctrine. Similarly, if the corporation lacks sufficient assets to respond in damages, "the balance of fairness might be tipped and jurisdiction over the individual might lie." *Bulova Watch Co., Inc. v. K. Hattori & Co., Ltd.*, 508 F.Supp. 1322, 1348 (E.D.N.Y.1981), *cited in Marine Midland Bank, N.A. v. Miller, supra*, 664 F.2d at 903. Neither of these equitable exceptions applies in this case, however, since there has been no showing that the individual counterclaim defendants are officers of "shell" corporations or that the corporations themselves are unable to respond in damages.

Accordingly, I find that the principles enunciated in *Marine Midland Bank, supra*, preclude the exercise of personal jurisdiction by this Court under any provision of New York's long-arm statute as to each of the eight individual counterclaim defendants.

b. Federal Claim—RICO

Counterclaim plaintiffs also argue that the RICO statute is a valid *predicate* for the exercise of personal jurisdiction over the eight individuals. They are correct.

RICO contains specific provisions authorizing nationwide service of process. *See* 18 U.S.C. § 1965(d). Moreover, "[w]here such nationwide service of process is authorized, a federal district court's jurisdiction is 'coextensive with the boundaries of the United States, [and] due process requires only that a defendant in a federal suit have minimum contacts with the United States.'" *Clement v. Pehar*, 575 F.Supp. 436, 438 (N.D.Ga.1983), *quoting FTC v. Jim Walter Corp.*, 651 F.2d 251, 256 (5th Cir.1981).

■ Assuming that there are sufficient minimum contacts by the counterclaim de-

fendants, the narrower question becomes whether the fiduciary shield doctrine circumscribes the breadth of a federal court's jurisdiction in a RICO case. If the doctrine is merely a judicial construction of the New York long-arm statute, it cannot limit RICO's jurisdictional scope. If, on the other hand, the doctrine is a constitutional principle of due process, it must be respected even in a purely federal question case.

In *Marine Midland Bank, N.A. v. Miller*, however, the court stated that "[t]he fiduciary shield doctrine is not a constitutional principle, but is rather a doctrine based on judicial inference as to the intended scope of the long-arm statute." 664 F.2d 902 n. 3 (emphasis added), *citing United States v. Montreal Trust Co.*, 358 F.2d 239, 242 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1399, 16 L.Ed.2d 440 (1966). Subsequent cases in other circuits have seized upon that language to reject the notion that the doctrine is "an integral part of due process under the Fourteenth Amendment." *Columbia Briargate Co. v. First National Bank in Dallas, supra*, 713 F.2d at 1058 (collecting cases). Accordingly, I hold that the fiduciary shield doctrine is inapplicable in a RICO case where plaintiff does not resort to New York's long-arm statute to establish a jurisdictional predicate.

2. Service Of Process

The second essential element of personal jurisdiction is notice to the defendant by a valid service of process. *DeMelo v. Toche Marine, Inc., supra*, 711 F.2d at 1264. In this action, service upon the individual American counterclaim defendants is governed by Fed.R.Civ.P. 4(e); service upon the individual Belgian counterclaim defendants is governed by Rule 4(i).

a. The American Counterclaim Defendants Rule 4(e) provides in part:

Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the

circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, service may be made under the circumstances and in the manner prescribed in the statute or rule.

Fed.R.Civ.P. 4(e). Thus, in a typical federal action a nonresident defendant may be served in the manner prescribed by federal statutes, if there are any, or in the manner prescribed by the State[1] rules of service.

Rule 4(e) is purely a service statute; it does not address the special venue requirements delineated in RICO's § 1965. In other words, even assuming the RICO counterclaim defendants were validly served under Rule 4, a point upon which I express no opinion, RICO's venue provisions must also be satisfied. *See* 18 U.S.C. § 1965(a) (venue is proper in "any district in which such person [defendant] resides, is found, has an agent, or transacts his affairs"). If venue is improper as to a particular defendant, the Court may order that defendant summoned if the plaintiff demonstrates that the "ends of justice" so require and that the action is properly venued under § 1965(a) as to at least one defendant already in the suit. *See* 18 U.S.C. § 1965(b).

Although the RICO venue question has not been briefed, the affidavits submitted by the American counterclaim defendants suggest that these individuals are not described in any of the venue classifications of § 1965(a). Nevertheless, because the RICO counterclaim is properly venued under § 1965(a) with respect to at least two counterclaim defendants (Soltex Polymer Corporation and Hedwin Corporation), fairness dictates that the counterclaim plaintiffs be afforded an opportunity to demonstrate that the "ends of justice" require the Court to order the joinder of at least the individual *American* counterclaim defendants under 18 U.S.C. § 1965(b).[2] The demonstrated absence of a single forum wherein venue would be proper as to all individual American counterclaim defendants would weigh heavily in the Court's consideration of such an application.

b. The Belgian Individual Counterclaim Defendants

Subdivision (i) of Fed.R.Civ.P. 4 governs service upon the individual Belgian counterclaim defendants. It states that "*[W]hen the federal or state law referred to in subdivision (e) of this rule authorizes service* upon a party not an inhabitant of or found within the state in which the district is held, and service is to be effected upon the party in a foreign country, it is also sufficient if service of the summons and complaint is made" in one of several alternate ways delineated in Rule 4(i) itself.

**1.** Under New York law, "[a] person domiciled in the state *or subject to the jurisdiction of the state under section 301 or 302* [the long-arm statute] . . . may be served with the summons without the state, in the same manner as service is made within a state . . . ." N.Y.Civ.Proc.Law § 313 (emphasis added). The highlighted language makes it clear that prior to resorting to New York's rules of service, the plaintiff must demonstrate that jurisdiction exists under one of the predicates specified in § 313. Although the counterclaim plaintiffs have alleged jurisdiction under § 302, the long-arm statute, I have ruled that jurisdiction does not lie under that section. *See* discussion *supra*. Thus, in the absence of any predicate specified in § 313, counterclaim plaintiffs may not resort to New York's rules of service. *See also* Fed.R.Civ.P. 4(e) ("service

may . . . be made *under the circumstances* and in the manner prescribed in the [state] statute or rule" (emphasis added)).

**2.** The counterclaim plaintiffs are also directed to apprise the Court of the precise manner in which each of the American individual counterclaim defendants was physically served with process. If the actual method of service comports with one of the alternative methods delineated in Rule 4, and if the Court determines that the interests of justice require joinder of the improperly venued RICO counterclaim defendants, the Court, in the interests of judicial economy, will deem service of process upon the American individuals to be effective *nunc pro tunc* under 18 U.S.C. § 1965(b).

Thus, subdivision (i) incorporates subdivision (e) by reference.

■ For the reasons stated in Footnote 1, *supra*, dealing with the American counterclaim defendants, the counterclaim plaintiffs may not resort to New York's rules of service to effect service upon the Belgian individuals. To reiterate, N.Y.Civ. Prac.Law § 313 (the section which authorizes service of process outside New York) may be utilized only if the defendant is a domiciliary of New York, is doing business in New York, or is subject to jurisdiction under (some interpretation of) N.Y.Civ. Prac.Law § 301 or § 302, the long-arm statute. Although the counterclaim plaintiffs assert jurisdiction under the long-arm statute, the Belgians (like the Americans) (1) do not have the requisite contacts with New York to support long-arm jurisdiction, and (2) are equally entitled to invoke the fiduciary shield doctrine. Accordingly, Fed.R.Civ.P. 4(e) does not authorize service upon the Belgians under *state* law.

■ Nor does there exist a valid method of service upon the Belgians under federal statutes or rules. Although RICO authorizes nationwide service of process, *see* 18 U.S.C. § 1965, it does not, by its very language, authorize service in a foreign country.

Because Rule 4(i) "speaks only to the manner of service and not to whether a particular defendant is amenable to suit— authority for extra-territorial service must be found in a relevant state or federal statute." 4 Wright & Miller, *Federal Practice and Procedure* § 1134, at 559 (1969). The Advisory Committee Notes to Rule 4(i) echo the commentators: "the authority for effecting foreign service must be found in a statute of the United States or a statute or rule of the State in which the district court is held providing in terms or upon proper interpretation for service abroad upon persons not inhabitants of or found within the State."

Here, the state rules of service are unavailable for the reasons discussed above, and the federal statute involved (RICO) does not provide for service in a foreign country. Thus, in the absence of statutory authority for effecting service abroad upon the Belgian individual counterclaim defendants, such service cannot be made.

### II. Personal Jurisdiction Over Solvay et Cie

Counterclaim plaintiffs assert personal jurisdiction over Solvay et Cie, the Belgian corporate counterclaim defendant, based upon N.Y.Civ.Prac.Law §§ 301 & 302 and 18 U.S.C. § 1965 (RICO).

In Part III of her Report and Recommendation, Magistrate Scheindlin concluded that Solvay et Cie was not subject to jurisdiction under either of the state predicates urged by the counterclaim plaintiffs. Report and Recommendation Of United States Magistrate, at pp. 21–40 (June 20, 1983). Having considered the Magistrate's Report and the counterclaim plaintiffs' objections thereto, I agree with the Magistrate's conclusion that Solvay et Cie is not subject to jurisdiction under N.Y.Civ.Prac.Law § 301 or § 302. Further, I adopt Part III of the Report and Recommendation as the opinion of the Court. *See Appendix, infra.*

The Report and Recommendation, however, does not address the availability of the RICO statute as a jurisdictional predicate, primarily because that argument was not pressed until the counterclaim plaintiffs filed their objections to the Magistrate's Report. Nevertheless, even though RICO might constitute a valid predicate for personal jurisdiction (assuming Solvay et Cie has sufficient minimum contacts with the United States), the RICO statute, itself, as discussed above, does not authorize service in a foreign country. Thus, as is the case with the two Belgian individual defendants, valid service of process cannot be made, and the counterclaims against Solvay et Cie must be dismissed.

### Conclusion

For all of the foregoing reasons, the motion to dismiss the six American individual counterclaim defendants is denied at this time. Counterclaim plaintiffs are

granted leave to file a motion within 20 days of the filing of this Order for permission to effect service under 18 U.S.C. § 1965(b). The motion to dismiss the two Belgian individual counterclaim defendants and Solvay et Cie is granted.

Lastly, because I find that the counterclaims against the Belgian counterclaim defendants were not filed unreasonably or in bad faith, their motion for an award of attorney's fees is denied.

SO ORDERED.

### Appendix
### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE

III. *Personal Jurisdiction Over Solvay*

A. *Factual Background*

Counterclaim plaintiffs assert personal jurisdiction over Solvay, the corporate counterclaim defendant, under N.Y.Civ.Prac.Law § 301, (McKinney 1971) which provides that a foreign corporation is present in New York for the purposes of personal jurisdiction if it is "doing business" within the state. *Frummer v. Hilton Hotels International Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967); *Bryant v. Finnish National Airlines,* 15 N.Y.2d 426, 260 N.Y.S.2d 625, 208 N.E.2d 625 (1965). Although it is conceded that Solvay is a Belgian Corporation and does not do business in New York,[12] counterclaim plaintiffs maintain that Solvay is doing business in New York by virtue of the presence here of the Solvay American Corporation ("TSAC").[13] TSAC is a Delaware Corporation with its offices in New York City, and is the wholly owned subsidiary of Solvay.[14] The counterclaim plaintiffs also argue that Solvay is doing business in New York due to the presence here of the Alkor Division of TSAC. This Division is the domestic distributor for the Alkor Corporation Gmbh, a European company, which is indirectly owned by Solvay.[15]

Counterclaim plaintiffs also argue that Solvay is subject to jurisdiction pursuant to N.Y.Civ.Prac.Law § 302(a)(2) and 302(a)(3)(i) and (ii) (McKinney 1971). *See, supra* p. 3. As discussed above (p. 10), counterclaim plaintiffs allege that their conspiracy claims arise out of tortious acts committed by the counterclaim defendants in New York. The alleged acts include the filing of the present lawsuit without probable cause and intentionally providing Standard and Poors with misleading information concerning the ownership of Hedwin. Jurisdiction over Solvay is premised on its participation in this conspiracy. Counterclaim plaintiffs further allege that the members of the illegal conspiracy, (including Solvay), committed tortious acts outside New York which caused harm to the counterclaim plaintiffs in New York. These acts include the perpetration of a fraud on the United States Patent and Trademark Office through false and fraudulent statements made in connection with the renewal of the trademark FORTILENE. The alleged harm which counterclaim plaintiffs claim to have incurred in New York is the cost of defending the infringement action brought against them by Soltex.

---

**12.** It is uncontested that Solvay itself is not incorporated, licensed, registered or qualified to do business in New York. Solvay owns no real property in New York, nor does it maintain offices here. Solvay does not advertise or engage in the solicitation of business in New York. *See* Levy Morelle Affidavit, pp. 3–5, submitted by Belgian Counterclaim Defendants in support of their motion to dismiss. Solvay does ship chemical products to customers in New York, but the mere shipment of goods into New York does not constitute "doing business" as defined by Section 301 of the CPLR. *See, e.g., J. Baranello & Sons v. Hausmann Industries, Inc.,* 86 F.R.D. 151 (E.D.N.Y.1980). *Selman v. Harvard Medical School,* 494 F.Supp. 603 (S.D.N.Y.) *aff'd,*

636 F.2d 1204 (2d Cir.1980). *See* Belgian Counterclaim Defendants Memorandum of Law in Support of Motion to Dismiss ("Belgian Memo"), pp. 16–17.

**13.** Counterclaim Plaintiffs Brief, pp. 42–45; Bain Affidavit, pp. 22–25.

**14.** Reply Memorandum in Support of Belgian Counterclaim Defendants' Motion to Dismiss ("Belgian Reply Memo"), p. 19; Bain Affidavit, pp. 24–25.

**15.** Bain Affidavit, p. 25, *See* p. 33, n. 24, *infra.*

B. *Legal Considerations*

1. *Jurisdiction Pursuant to N.Y.Civ. Prac.Law § 301*

As set forth in *Marine Midland, supra,* 664 F.2d at 904, "If the court chooses not to conduct a full blown evidentiary hearing on the (12b) motion the plaintiff need only make a *prima facie* showing of jurisdiction through its own affidavits and supporting materials." Thus, the sole question here is whether counterclaim plaintiffs have made a *prima facie* showing that Solvay is "doing business" in New York as required by *Frummer v. Hilton Hotels* and *Bryant v. Finnish National Airlines, supra.*

In *Bulova Watch Co. Inc. v. K. Hattori & Co. Ltd., supra,* 508 F.Supp. at 1333, 1334, Chief Judge Weinstein discussed the issue of whether a parent corporation is present in New York for jurisdictional purposes by virtue of the presence in New York of its subsidiary.

(A) corporation may be amenable to New York personal jurisdiction when the systematic activities of a subsidiary in this state may fairly be attributed to the parent. The line of cases from *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 204 N.E.2d 329 (1965), through *Public Administrator of New York County v. Royal Bank of Canada,* 19 N.Y.2d 127, 278 N.Y.S.2d 378, 224 N.E.2d 877 (1967), and *Frummer v. Hilton Hotels International, Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (1967), establishes the rule that a foreign corporation does business in New York if its affiliated company is in effect a "local department separately incorporated," *Taca International Airlines, S.A. v. Rolls-Royce of England Ltd.,* 15 N.Y.2d at 102, 256 N.Y.S.2d at 132, 204 N.E.2d at 331, or it acts as agent by "do(ing) all the business which (the principal) could do were it here by its own officials." *Frummer v. Hilton Hotels International, Inc.,* 10 N.Y.2d at 537, 281 N.Y.S.2d at 44, 227 N.E.2d at 854; *Gelfand v. Tanner Motors Tours, Ltd.,* 385 F.2d [116] at 121 (independent repre-

sentative was acting as agent for purposes of the statute).

Further, Chief Judge Weinstein stated that the parent-subsidiary relationship in itself is not sufficient to establish personal jurisdiction over the foreign parent. *Id.* at 1334, *citing, Saraceno v. S.C. Johnson & Son Inc.,* 83 F.R.D. 65 (S.D.N.Y.1979) (100% owned subsidiary); *Baird v. Day & Zimmerman Inc.,* 390 F.Supp. 883 (S.D.N.Y.1974) (82% owned subsidiary).

Finally, the Chief Judge set out two tests for determining the closeness of the economic connection between the parent and the subsidiary. Both tests look to the realities of the particular parent-subsidiary relationship rather than the form. The first test determines whether the relationship between the foreign parent and the local subsidiary gives rise to a valid inference of an agency relationship. The second test determines whether control by the parent of the subsidiary is so complete that the subsidiary is in fact a mere department of the parent. *Bulova, supra,* 508 F.Supp. at 1334, *citing, Freemen v. Gordon and Breach, Science Publishers, Inc.,* 398 F.Supp. 519, 522 (S.D.N.Y.1975), *quoting, Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 528 (S.D.N.Y.1972). Chief Judge Weinstein emphasized that the two tests may be used in conjunction with each other. Indeed he stated that, "it should be clear from the mass of cases dealing with this problem that a line cannot be simply drawn between the two tests." *Bulova, supra,* 508 F.Supp. at 1334.

2. *Jurisdiction Pursuant to N.Y.Civ. Prac.Law §§ 302(a)(2) and (a)(3)*

In order to establish jurisdiction under either N.Y.Civ.Prac.Law § 302(a)(2) or § 302(a)(3) (McKinney 1971) the counterclaim plaintiffs must first show that a tort was committed by the counterclaim defendant itself, or that the counterclaim defendant caused its agent to commit the alleged tortious act. Furthermore, with respect to N.Y.Civ.Prac.Law § 302(a)(3) (McKinney 1971) counterclaim plaintiffs must show that the corporate counterclaim defendant satisfies the requirements of subsections (i)

and (ii). (*See* pp. 2–3, n. 3, *supra.*) If the counterclaim defendant, Solvay, is alleged to have committed the tortious acts through the actions of a co-conspirator, counterclaim plaintiffs must offer concreate evidence regarding the existence of a conspiracy and Solvay's part in it.[16]

The mere assertion of a conspiracy by the counterclaim plaintiffs is insufficient. *Lehigh Valley Industries Inc. v. Birenbaum*, 527 F.2d 87, 93–4 (2d Cir.1975); *Bulova, supra,* 508 F.Supp. at 1347. Plaintiffs are required to establish *prima facie* proof of the existence of a conspiracy through "definite facts." *Merkel Associates Inc. v. Bellofram Corp.*, 437 F.Supp. 612, 617 (W.D.N.Y.1977); *Socialist Workers Party v. Attorney General of the United States*, 375 F.Supp. 318, 322 (S.D. N.Y.1974). Specific facts showing that a particular defendant knowingly participated in the conspiracy must also be alleged. *Socialist Workers Party v. Attorney General of the United States, supra; Lehigh Valley Industries Inc. v. Birenbaum, supra.* Finally, facts must be presented which connect the counterclaim defendant with the transactions occuring in New York. *Socialist Workers Party, supra,* 375 F.Supp. at 321–22; *Lehigh Valley Industries Inc., supra,* 389 F.Supp. at 806–7.[17]

**C. Solvay's Relationship to the Alleged Conspiracy—N.Y.Civ.Prac.Law § 302(a)(2) and (a)(3).**

Counterclaim plaintiffs have failed to meet the requirements of N.Y.Civ. Prac.Law §§ 302(a)(2) and (a)(3) (McKinney 1971) with respect to the assertion of jurisdiction over Solvay. There has been no *prima facie* showing that a conspiracy existed or that Solvay was a member of any such conspiracy. Absolutely no evidence has been offered to show that any co-conspirators acted at Solvay's direction or under its control. Counterclaim plaintiffs rely on the very general notion that since Solvay owns a majority of the outstanding stock of Soltex, control of Soltex emanates from Solvay's corporate headquarters in Belgium. (*See,* Counterclaim Plaintiffs Brief, pp. 23–24). Although counterclaim plaintiffs attempt to establish a nexus between Solvay and Soltex with regard to the general decision making process and operation of Soltex, (Bain Affidavit pp. 19–20), the counterclaim plaintiffs do not succeed in showing any communication or contact between Solvay and Soltex regarding the institution of the present lawsuit. *See Ghazoul, supra.* Evidence that Solvay played a part in the general management of Soltex does not amount to a *prima facie*

16. Counterclaim plaintiffs offer no evidence whatsoever that Solvay itself committed any of the tortious acts discussed at p. 10, *supra.* In fact, the evidence is to the contrary. Both Solvay and Loutrel state in their affidavits that they were unaware of counterclaim plaintiffs or this lawsuit until 18 months after the suit was filed. (Solvay Affidavit, pp. 7–8; Loutrel Affidavit, pp. 5–6). Soltex's Chief Executive Officer, Whitson Sadler has testified at deposition that the decision to file suit against Fortex was made solely by Soltex. Sadler Deposition, p. 274, 289–299); *accord,* Osterrieth Deposition, pp. 270–75. Solvay and Loutrel have also shown that they knew nothing of any information transmitted to Standard and Poors or to the United States Patent and Trademark Office. (Solvay Affidavit, p. 8; Loutrel Affidavit p. 6) Since counterclaim plaintiffs have supplied no contrary evidence, their sole claim here is that Solvay was a member of a conspiracy whose other members engaged in the alleged tortious activity.

A reading of Sadler's and Osterrieth's depositions reveal that Fortex's counsel questioned these witnesses extensively as to Solvay's participation in and knowledge of Soltex's activities charged in this counterclaim. Thus, Fortex has had some discovery on the jurisdictional issues raised here.

17. Courts have held that this requirement may be satisfied by a showing that the co-conspirator acted more or less like an agent of the non-resident defendant; i.e. by acting at the direction or under the control of the non-resident defendant, or by engaging in tortious conduct done for the benefit and with the knowledge of the non-resident co-conspirator. A showing that the non-resident co-conspirator had knowledge of the affects of the tortious conduct along with the other "contacts" is adequate. *See, Grove Press Inc. v. Angleton,* 649 F.2d 121, 122–23 (2d Cir. 1981) *See also, Ghazoul v. International Management Services Inc.,* 398 F.Supp. 307 (S.D.N.Y. 1975) (jurisdiction upheld because *definite* evidentiary facts shown to prove defendant's part in a conspiracy through contact with other co-conspirators).

showing that Solvay participated in the illegal conspiracy described by counterclaim plaintiffs.

As to the remaining requirements set forth at p. 1456, *supra*, no evidence has been offered by the counterclaim plaintiffs to connect Solvay with any of the illegal actions alleged to have occurred in New York. The only argument that the counterclaim plaintiffs have made is that whatever benefits Soltex, benefits Solvay, and that any action taken by Soltex is done at Solvay's direction. This speculative and conclusory argument is insufficient to support the existence of personal jurisdiction. It simply does not rise to the level of "definite evidentiary facts", which are required to make even a threshold showing of amenability to jurisdiction. *Merkel Associates Inc., supra,* 437 F.Supp. at 617; *Socialist Workers, supra,* 375 F.Supp. at 322.

Finally, no evidence has been offered to support the requirement that the alleged tortious acts were done for Solvay's benefit or that Solvay was aware of any such acts. The counterclaim complaint itself (p. 37) charges that Soltex and Hedwin were the intended beneficiaries of the illegal conspiracy. Impliedly the counterclaim plaintiffs are asking this Court, once again, to assume that whatever benefits Soltex benefits Solvay, and that Solvay is aware of everything Soltex does to further its own interests. These assumptions are not conclusive.

Because this Court finds that the counterclaim plaintiffs' allegations of conspiracy are without adequate foundation as to

Solvay, jurisdiction can not be sustained under N.Y.Civ.Prac.Law § 302(a)(2) or (a)(3) (McKinney 1971). This conclusion is compelled since no showing has been made that Solvay either committed a tortious act in New York, or outside of New York causing foreseeable harm in New York, or through the actions of a co-conspirator so as to subject Solvay to this Court's jurisdiction.[18]

### D. *The Relationship of TSAC and Alkor to Solvay—N.Y.Civ.Prac.Law § 301*

Counterclaim plaintiffs maintain that Solvay does business in New York through TSAC, a service organization which collects information exclusively for Solvay and the "Solvay group" (a term used to describe Solvay's subsidiaries and affiliates).[19] Based on the following allegations, gleaned from the deposition of Silvia W. Ritchie, Executive Administrative Assistant to the President and Office Manager of TSAC, counterclaim plaintiffs ask this Court to find that TSAC is an "agent" or "department" of Solvay, thus subjecting Solvay to the jurisdiction of this Court.

Counterclaim plaintiffs allege that TSAC receives direct requests for information from individual departments within Solvay and from individual members of the "Solvay group". They further allege that TSAC's revenues are derived solely from its service contract with Solvay. Moreover, TSAC provides certain incidental services to Solvay and the "Solvay group" including making travel arrangements and hotel accomodations. In addition, plaintiffs allege that TSAC makes a yearly financial report

---

**18.** Since Solvay does not regularly do or solicit business in New York pursuant to § 302(a)(3)(i), the Court examined § 302(a)(3)(ii) which requires that the defendant derive substantial revenue from interstate or international commerce, easily satisfied here, and that the harm in New York be foreseeable. Once again, there is no showing that Solvay could have reasonably anticipated any harm to counterclaim plaintiffs in New York as a result of the alleged tortious acts. The affidavits of Solvay's officers, all of which are uncontroverted, state that they were unaware of counterclaim plaintiffs' existence until well after this suit was filed. Thus, *a fortiori,* they could not have anticipated that Fortex et al., would suffer

harm in New York at the time the alleged acts were committed.

**19.** Counterclaim Plaintiffs Brief, p. 43; Bain Affidavit, pp. 24–25. The information gathered by TSAC relates to the "sales and marketing of products in the chemical and bio-chemical field, as well as information concerning paints and coatings and information relating to federal and state regulations." (Ritchie Deposition, pp. 24–25, 28–36). The term "Solvay group" is used by Ms. Ritchie to describe the various subsidiaries and affiliates of Solvay in the United States and Europe.

to the Department of Finance at Solvay.[20] Finally, plaintiffs allege that Solvay derives economic benefit from TSAC's operations.[21] In sum, TSAC has been described by Michael Osterreith, a Soltex director, as the "eyes and ears" of Solvay.[22]

Counterclaim defendants have relied on the deposition of Silvia W. Ritchie, the same source relied on by the counterclaim plaintiffs, to show that TSAC is neither an "agent" nor a "department" of Solvay. According to the counterclaim defendants, TSAC has its own directors, officers and employees, none of whom is an employee of Solvay, who conduct and control the daily operations of TSAC. (Ritchie Deposition, pp. 69, 94–95, 98–100). They further allege that TSAC maintains separate corporate books and records, bank accounts and audited financial statements. (*Id.* at 93–94). Finally, the counterclaim defendants point out that TSAC does not submit regular reports concerning its activities to Solvay (*id.* at 87–91), and Solvay does not supervise TSAC's daily operations. (*Id.* at 94, 110–11).[23]

Ms. Ritchie, in her deposition, also testified with respect to Alkor, which is located in New York and is a part of TSAC. (Ritchie Deposition, pp. 14, 83). Alkor purchases and resells, as a distributor, roofing products manufactured by Alkor Gmbh, which is a European company indirectly owned by Solvay.[24] (*Id.* p. 18). Alkor receives orders from salesmen in the United States, which are filled either from inventory maintained in the United States or are transferred to the European headquarters to be filled. (*Id.*, pp. 124–125).

A foreign corporation is amenable, of course, to jurisdiction under N.Y.Civ. Prac.Law § 301 (McKinney 1971) if it is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964). A corporation, moreover, is amenable to jurisdiction in New York when the "systematic activities of a subsidiary in this state may fairly be attributed to the parent." *Bulova, supra*, 508 F.Supp. at 1333. In *Frummer v. Hilton Hotels Int.*, 19 N.Y.2d 533, 537, 281 N.Y.S.2d 533, 227 N.E.2d 851 (1967), the Court held that the parent corporation was doing business in New York because its local subsidiary "does all the business which Hilton (U.K.) could do were it here by its own officials." In *Frummer* the non-profit New York subsidiary generated business for the parent's hotels through public relations and publicity work and the acceptance and confirmation of room reservations. Similarly, in *Bush v. Stern Bros. & Co.*, 524 F.Supp. 12, 14 (S.D.N.Y.1981), the court held that in order to sustain jurisdiction over a foreign defendant, "the business done in New York (by its agent) must be a substantial part of defendant's main business."

Here TSAC is neither a manufacturing nor a sales subsidiary of Solvay. It does not engage in the activities which are Solvay's "corporate *raison d'etre*." *Bulova, supra*, 508 F.Supp. at 1341. TSAC's activities do not appear to be particularly significant, in a business sense, to Solvay's overall activities, namely the manufacture and sale of chemical and biochemical products.

**20.** Counterclaim Plaintiffs Brief, pp. 43–45; Bain Affidavit, pp. 24–25.

**21.** No proof is offered in support of this allegation. TSAC receives a contractual fee *from* Solvay. That Solvay or its subsidiaries might profit from TSAC's information gathering is mere speculation.

**22.** Counterclaim Plaintiffs Brief, pp. 43–45; Bain Affidavit, pp. 7, 24, *quoting* Osterreith Deposition.

**23.** *See generally*, Belgian Reply Memo, pp. 19–20.

**24.** *See* Letter of March 10, 1983 from William Norfolk, Counsel to Solvay, discussing Solvay's indirect ownership interest in Alkor Gmbh.
  "Solvay et Cie ownes most of the stock of a Germany (sic) company (a minority interest is owned by unaffiliated shareholders) which in turn owns 95% of the stock (5% is owned by an unaffiliated individual) of another German company and Alkor Gmbh is a wholly-owned subsidiary of the latter company."

*See Marantis v. Dolphin Aviation Inc.*, 453 F.Supp. 803, 807 (S.D.N.Y.1978). TSAC does not generate business for Solvay either by direct sales or the taking or confirming of orders. The fact that TSAC is a wholly-owned subsidiary of Solvay which primarily gathers information for Solvay and the "Solvay group" is jurisdictionally irrelevant since TSAC does not do that business which Solvay would do were it present and doing business in New York.[25] Thus, TSAC is not acting as Solvay's agent for the purpose of conducting business in New York.

Whether or not TSAC is a "mere department" of Solvay is also irrelevant from a jurisdictional perspective. A subsidiary has been found to be a "mere department" of the parent when the parent exercises almost total control over the subsidiary's activities. Such control is evidenced by financial domination, control of sales and internal corporate policies. Here, TSAC may indeed be a research and information department of Solvay. As mentioned earlier, TSAC's only client is Solvay for whom it gathers information relating to sales, marketing, technology and government regulations. Nonetheless, this type of activity, even if performed by Solvay directly, would not be sufficient to support a finding that Solvay is "doing business" in New York.

The question of what constitutes "doing business" is not easily answered. There is no magical formula for evaluating the evidence; each case must be decided on its own facts.

> It is self evident ... that a doing business determination is unique to each case, requiring a careful consideration of all the facts and circumstances without relying too heavily on any one factor. *Katz Agency Inc., v. Evening News Ass'n.*, 514 F.Supp. 423, 427 (S.D.N.Y. 1981).

A review of the cases reveals that doing business requires systematic conduct of a permanent and continuous nature. This conduct always includes selling a product, generating sales or bringing revenue. *See*, e.g., *Taca International Airlines, S.A. v. Rolls Royce, Ltd.*, 15 N.Y.2d 97, 256 N.Y. S.2d 129, 204 N.E.2d 329 (1965) (sale of Rolls Royce products); *Frummer, supra*, (soliciting business, confirming hotel reservations); *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116 (2d Cir.1967); ("drumming up business," making and confirming reservations); *Bulova, supra* (sale of Hattori's watches); *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982) (solicitation and servicing of New York accounts).[26] By this standard there can be no doubt that Solvay does not do business in New York through TSAC which sells none of Solvay's products, drums up no business, and brings in no revenue for its parent.[27] Thus, counterclaim plaintiffs have failed to make a *pri-*

---

25. "It now appears to be the rule that where a foreign corporation has a subsidiary or other "agent" perform substantial activities in this state for its benefit—acts which are so essential to the foreign corporation that if the subsidiary or "agent" did not perform them, the foreign corporation would have to—it is doing business in this state, regardless of whether the New York company is a true agent or is an independent contractor." McLaughlin, Practice Commentaries C301:3, pp. 12–13 (McKinney 1971).

26. In *Bush, supra*, 524 F.Supp. at 14, the court stated that,
   "(t)he location in New York of firms such as law firms and investment services, which perform services for Stern Bros. for a fee does not represent activity by Stern Bros. in New York for jurisdictional purposes."
   *See also Brocia v. Franklin Plan Corporation* [235 A.D. 421, 257 N.Y.S. 167] (4th Dep't 1932)

(research and executive training conducted in New York by Vice President of foreign company held *not* to constitute doing business).

27. Counterclaim plaintiffs would have this Court assert jurisdiction over Solvay on the basis of the activities of the Alkor Division of TSAC. (See p. 33 *supra*) Alkor's activities will not sustain jurisdiction over Solvay. Alkor's parent, as noted above, is only indirectly owned by Solvay. It is clearly an independent company which is neither acting as Solvay's agent nor as a "mere department" of Solvay. Alkor sells only roofing materials, a product not sold or manufactured by Solvay. Thus, Alkor certainly does not do that business which Solvay would do were it in business here. *See Frummer* and *Bulova, supra*. Jurisdiction cannot be premised on the activities of the Alkor Division of TSAC.

*ma facie* showing that Solvay is present in New York for jurisdictional purposes.

New York has chosen not to forsake its "doing business" test in favor of the more liberal "minimum contacts" test set forth in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See Bush v. Stern Bros., supra,* 524 F.Supp. at 14; *Marantis, supra,* 453 F.Supp. at 808. ("This Court must conclude that New York has not yet chosen to exercise to the fullest its jurisdictional prerogative under the Constitution." *Id.*) Thus, although Solvay's activities within New York, through TSAC and its Alkor Division, might be sufficient to establish that Solvay has minimum contacts with New York, as defined by case law; such contacts will not support this Court's assertion of *in personam* jurisdiction which is governed by New York's stricter "doing business" test.[28]

In the final analysis this Court must determine whether it would be fair to require Solvay to defend an action in New York. Although jurisdiction may be asserted under § 301 when the "cause of action sued upon has no relation in its origin to the business here transacted," *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 115 N.E. 915 (1917), recently several courts have weighed the local agent's activities with regard to the matters charged in the complaint as a factor which may be considered in determining whether the foreign defendant should be subject to jurisdiction. "A court might well find substantial unfairness were it to drag a foreign parent into court to defend itself against actions completely unrelated to the subsidiary corporation's purposive activities on behalf of its parent." *Bulova, supra,* 508 F.Supp. at 1344.

*See also Tokyo Boeki (U.S.A.), Inc. v. S.S. Navarino,* 324 F.Supp. 361 (S.D.N.Y.1971); *SCM Corporation v. Brother International Corporation,* 316 F.Supp. 1328, 1334 (S.D.N.Y.1970) (jurisdiction over foreign defendant proper "especially since the underlying action arises out of and is closely connected with (this) conduct and activity" justifying jurisdiction). Here, the activities of TSAC would appear to be wholly unrelated to the matters alleged in the counterclaim complaint. No connection, however remote, has been shown between TSAC's (or Alkor's) activities and those charged against Solvay. Thus, in addition to the finding that Solvay does not "do business" in New York, it would be manifestly unfair to require Solvay to defend itself against these charges in New York. Solvay has done nothing to subject itself to this Court's jurisdiction.

---

28. In diversity cases, amenability to suit must be determined according to the law of the state in which the court sits. *Arrowsmith v. United Press Int'l,* 320 F.2d 219 (2d Cir.1963).